# Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion

The Attorney General may enter into settlements that would limit the future exercise of executive branch discretion when that discretion has been conferred upon the executive branch pursuant to statute and there exists no independent statutory limitation on the authority of the executive branch to so limit the future exercise of that discretion.

The Attorney General's power to enter into settlements that would limit the future exercise of discretion that has been conferred upon the executive branch directly by the Constitution is constrained by the very constitutional provisions that vest discretionary authority in the President and therefore necessarily preclude the President from subjecting the exercise of that discretion to the control of the other party to a settlement or to judicial enforcement.

Article III of the Constitution does not preclude the executive branch from entering into judicially enforceable, discretion limiting settlements as a general matter or bar federal courts from entering consent decrees that limit executive branch discretion whenever such decrees purport to provide broader relief than a court could have awarded pursuant to an ordinary injunction. Article III limitations may arise, however, when, for example, the terms of the governmental promise are too amorphous to be susceptible to Article III federal judicial enforcement.

Although there may be sound policy reasons to reaffirm Attorney General Meese's 1986 policy regulating the use of discretion limiting settlements, the concerns that led to its adoption do not, in general, amount to legally binding limitations on the scope of the executive branch's power to settle litigation in a manner that may limit the future exercise of executive branch discretion.

June 15, 1999

MEMORANDUM OPINION FOR THE ASSOCIATE ATTORNEY GENERAL

This memorandum addresses the degree to which federal law places restrictions on the authority of the United States to enter into litigation settlements that purport to limit the exercise of executive branch discretion.[1] It focuses primarily on the concerns about the legality of discretion-limiting settlements that led to the adoption of Attorney General Meese's 1986 policy regulating the use of such settlements by attorneys acting under the supervision of the Attorney General. In doing so, the memorandum addresses a central legal tenet of Attorney General Meese's policy: that it is unconstitutional for the courts to enter consent decrees limiting the exercise of executive branch discretion where the courts would not have had the power to order such relief had the matter been litigated.

Attorney General Meese issued the 1986 policy on consent decrees and settlement agreements pursuant to his litigation and settlement authority. The policy

---

[1] For purposes of this memorandum, the term "settlements" is employed to refer to both settlement agreements and consent decrees. There are, however, practical and legal distinctions between settlement agreements and consent decrees. Settlement agreements are simply private contracts, which may be enforced upon breach. Consent decrees are court orders, which may be enforced immediately by contempt and may be modified over the objections of the parties to them. *See United States v Swift & Co*, 286 U S. 106 (1932); Timothy Stoltzfus Jost, *Commentary: The Attorney General's Policy on Consent Decrees and Settlement Agreements*, 39 Admin. L. Rev 101, 109–10 (1987)

126

requires the Attorney General, the Deputy Attorney General, or the Associate Attorney General, to approve proposed consent decrees or settlement agreements that:

> (1) commit the executive branch to expend unappropriated funds or seek appropriations from Congress;
>
> (2) commit the executive branch to promulgate, amend, or revise regulations; or
>
> (3) divest discretionary power granted by Congress or the Constitution to respond to changing circumstances, to make policy or managerial choices, or to protect the rights of third parties.[2]

Determining whether a settlement of the type identified in the Meese Policy conforms to federal law requires a close analysis of the relevant statutory and constitutional provisions. A context-specific inquiry is beyond the scope of this memorandum, however, and thus our intent is to set forth the basic approach that should guide an evaluation of the legal validity of executive branch settlements that purport to limit the exercise of executive branch discretion.[3]

Our analysis proceeds with a summary of our legal conclusions. We then outline our understanding of the basic parameters of the Meese Policy and the types of settlements to which it is directed. Next, we set forth the general legal principles that establish the background against which the types of settlements identified in the Meese Policy must be evaluated. Finally, we apply the general legal principles to the types of settlements to which the Meese Policy is directed.

## I. Summary of Conclusions

Due to the length of this memorandum, it is useful to state our conclusions in summary form at the outset. In general, we conclude that the Attorney General is free to enter into settlements that would limit the future exercise of executive branch discretion when that discretion has been conferred upon the executive branch pursuant to statute and there exists no independent statutory limitation on

---

[2] *See* Memorandum for All Assistant Attorneys General and All United States Attorneys, from Edwin Meese III, Attorney General, *Re: Department Policy Regarding Consent Decrees and Settlement Agreements* at 3, 4 (Mar. 13, 1986) ("Meese Policy"). Regulations reflecting the Meese Policy are set forth at 28 C F R §§ 0.160–0.163 (1998)

[3] "General principles may be drawn from dictum in cases dealing with the constitutional prohibition on state laws impairing the obligation of contracts, U.S Const art. 1, § 10, from cases upholding one administration's decision to change a policy adopted by its predecessors; from cases limiting the power of the judiciary, in the absence of any contract, to direct the Executive in the exercise of its discretion; and from cases holding that particular contracts made by one Administration are binding on its successors However, these broad principles might point to different results in different contexts, depending on the legal rights of the private party, the type of policymaking discretion involved, and the extent to which, and for how long, the government's discretion is curtailed." *National Audubon Soc'y, Inc. v. Watt,* 678 F.2d 299, 305 n 12 (D.C. Cir 1982)

the authority of the executive branch to so limit the future exercise of that discretion. Significant general statutory limitations that, among others, must be considered in evaluating the lawfulness of possible discretion-limiting settlement terms are those contained in the Administrative Procedure Act, which sets forth restrictions on the manner in which the executive branch may adopt and revise regulatory rules and procedures, and the Anti-Deficiency Act, which restricts the authority of executive branch actors to incur financial obligations on behalf of the United States. With respect to settlements that would limit the future exercise of discretion that has been conferred upon the executive branch directly by the Constitution, such as the discretion that is conferred upon the President by the Pardon Power or the Recommendations Clause, the scope of the Attorney General's settlement power is constrained by the very constitutional provisions that vest discretionary authority in the President and therefore necessarily preclude the President from subjecting the exercise of that discretion to the control of the other party to a settlement or to judicial enforcement.

In addition, we conclude that Article III may place independent constitutional limitations on the power of federal courts to enforce settlements that the Attorney General otherwise would have the legal authority to enter. These limitations may arise when, for example, the terms of the governmental promise are too amorphous to be susceptible to Article III federal judicial enforcement. We do not believe, however, that Article III precludes the executive branch from entering into judicially enforceable discretion limiting settlements as a general matter or that Article III bars federal courts from entering consent decrees that limit executive branch discretion whenever such decrees purport to provide broader relief than a court could have awarded pursuant to an ordinary injunction.

From these general conclusions, it is possible to set forth in summary form the main determinations that we have reached regarding the extent to which federal law would preclude discretion-limiting settlements of the type that are subject to the requirements of the Meese Policy.

*First*, the Meese Policy in sections II(A)(2) and II(B)(2) raises concerns about the authority of the executive branch to enter into settlements that would commit the United States to expend unappropriated funds or seek appropriations from Congress. *See* Meese Policy at 3–4. We conclude that there is no per se constitutional bar against executive branch settlements that obligate the future expenditure of unappropriated funds. As the Antideficiency Act itself makes clear, Congress may authorize the executive branch to obligate funds in advance of appropriations. Thus, settlements that incur such obligations are permissible so long as there is statutory authority, whether explicit or implicit, for the assumption of the future financial obligation. Implicit authority to assume such obligations should not be readily inferred from general statutory authority, however, nor should the interest in settling litigation be thought in and of itself, at least as a general matter, to justify a construction of general statutory authority that would suffice to permit

such an obligation to be incurred. We also conclude that the Constitution does limit the ability of the executive branch to settle litigation on terms that would require executive branch officers to seek appropriations from Congress. This limitation arises primarily from the Recommendations Clause.

*Second,* the Meese Policy in sections II(A)(1) and II(B)(1) raises concerns about the authority of the executive branch to enter into settlements that would convert the otherwise discretionary authority of executive branch agencies to promulgate, amend, or revise regulations into a mandatory regulatory duty. *See* Meese Policy at 3. We conclude that there is no per se constitutional prohibition against such settlements, and that, in the main, the executive branch's authority to enter into settlements that impose such limitations will be determined by the statutes that govern the executive branch agency on whose behalf the settlement would be entered. We emphasize that the Administrative Procedure Act generally limits the manner by which executive branch agencies may adopt, amend, or revise regulatory rules and procedures, and thus that it will be important to ensure that the terms of any settlement limiting the otherwise discretionary regulatory authority of an executive branch agency conform to the terms of that Act.

*Third,* the Meese Policy in sections II(A)(3) and II(B)(2) raises concerns about the authority of the executive branch to divest discretionary power granted by Congress or the Constitution to respond to changing circumstances, to make policy or managerial choices, or to protect the rights of third parties. *See* Meese Policy at 3–4. Here, we conclude that there is no per se constitutional prohibition against settlements of this type that divest discretionary power granted by Congress, and that, in the main, the executive branch's authority to enter into such settlements will be determined by the statutes that govern the executive branch agency on behalf of which the settlement would be entered. However, the Constitution does bar settlements that would divest the executive branch of discretionary power that has been conferred directly by the Constitution, such as the Recommendations Power or the Pardon Power. In addition, while the executive branch may not settle on terms that would infringe the constitutional rights of third parties, there is no independent constitutional limitation on the authority of the executive branch to enter settlements that would constrain the federal government's discretion to protect the non-constitutional interests of third parties. There may be, however, statutory provisions that protect the interests of third parties, such as the notice and comment requirements of the Administrative Procedure Act, that limit the settlement authority of the executive branch.

In sum, our review leads us to conclude that there are statements in the Meese Policy that appear to adopt an overly narrow view of the legal authority of the Attorney General to settle litigation. In addition, we conclude the policy's distinction between the rules that govern settlement agreements and consent decrees is not one that a concern about the legal authority of Article III federal courts would justify. For these reasons, we conclude that while there may be sound policy rea-

sons to reaffirm the Meese Policy, the concerns that led to its adoption do not, in general, amount to legally binding limitations on the scope of the executive branch's power to settle litigation in a manner that may limit the future exercise of executive branch discretion.

## II. Background Assumptions

Before proceeding to a consideration of the legal principles that define the scope of the Attorney General's settlement power, it is useful to set forth the background assumptions that govern our understanding of the Meese Policy and that underlie our analysis of the lawfulness of the types of settlements that are subject to the requirements of that policy.

As we have suggested, it is not entirely clear whether the restrictions set forth in the Meese Policy are rooted in policy or legal concerns. The Meese Policy does not by its terms appear to be premised on a conclusion that the Constitution or other federal law precludes the Attorney General from entering into settlements that would limit the future exercise of executive branch discretion. The Meese Policy does not actually preclude the United States from entering into any settlements; it simply requires that certain settlements — i.e., those that purport to limit executive branch discretion — be approved by the Attorney General, the Deputy Attorney General, or the Associate Attorney General. *See* Meese Policy at 4. In this respect, the Meese Policy appears to reflect a policy judgment about how settlements decisions of certain types should be made within the Department of Justice ("Department") rather than a legal conclusion regarding the extent of the Attorney General's lawful power to enter into certain kinds of settlements.

Nevertheless, there are some indications that the Meese Policy is rooted in legal concerns regarding the constitutionality of discretion-limiting executive branch settlements. The policy declares that it is intended to respond to concerns that, in some cases, executive branch settlements have improperly authorized federal courts to oversee the exercise of executive branch discretion and thereby have infringed upon executive branch prerogatives in violation of the constitutional separation of powers. *See* Meese Policy at 1. Furthermore, the Meese Policy asserts that it is designed to "ensure that litigation is terminated in a manner consistent with the proper roles of the Executive and the courts." *Id.*; *see also* Transcript of Press Conference with Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 2–3 (Mar. 21, 1986) ("Cooper Press Conference").

While there may be sound policy reasons for centralizing the process for approving certain lawful compromises that would limit executive branch discretion, *see* Stoltzfus Jost, *supra* at 105–06, this memorandum considers only the degree to which the Constitution, or other federal law, as a general matter, limits the use of settlements by the executive branch that purport to circumscribe the

exercise of executive branch discretion. Thus, the memorandum is intended to make clear the degree to which the limitations imposed by the Meese Policy are properly rooted in constitutional or other legal concerns rather than to set forth the preferred departmental policy for the use of such settlements.

For purposes of setting forth the nature of these legal limitations, it is important to describe the type of agreements to which we believe the Meese Policy is directed and to which the following analysis applies. We understand the Meese Policy to be concerned with, and we accordingly address, those settlements that are enforceable by Article III courts and that in some meaningful respect bind the exercise of executive branch discretion. We therefore do not consider the limits that federal law may place on the Attorney General's authority to enter into agreements that may be enforced in non-Article III tribunals; that are not intended to be legally binding in any adjudicative forum; or that provide as the sole remedy for governmental breach the re-institution of the litigation in its entirety. *See* Memorandum for Anthony C. Liotta, Acting Assistant Attorney General, Land and Natural Resources Division, from Larry L. Simms, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Consent Judgment in Environmental Defense Fund, et al. v. Costle* at 2 & n.* (Mar. 30, 1981) (*"Costle* Memo"); Meese Policy at 4 (stating that "revival of the suit" shall be "the sole remedy" for the executive branch's failure to comply with the terms of a settlement agreement that limits the exercise of executive branch discretion). Agreements of these types either impose no legally meaningful constraint on executive branch discretion, *Costle* Memo at 2, or raise separation of powers concerns that are distinct from the ones that are identified by the Meese policy. *See, e.g., Constitutional Limitations on Federal Government Participation in Binding Arbitration,* 19 Op. O.L.C. 208 (1995) (*"Binding Arbitration"*) (discussing constitutional concerns raised by giving binding effect to the decisions of congressionally controlled arbitration panels).

Moreover, although virtually every judicially enforceable executive branch settlement limits the exercise of executive branch discretion to some degree, we address here only those executive branch settlements that render ordinarily "revisable" executive branch discretion less "revisable." *See* Peter M. Shane, *Federal Policy Making by Consent Decree: An Analysis of Agency and Judicial Discretion,* 1987 U. Chi. Legal F. 241, 243–46.[4] We have limited our analysis in this way because we understand the Meese Policy's limitations to be directed only at settlements of this type. An example of a settlement that would render ordinarily revisable executive branch discretion less revisable would be a binding promise by an agency to investigate a particular issue as a possible subject for rule making or enforcement. An agency's decision whether to conduct such an investigation is normally both discretionary and revisable; absent a statutory mandate, the

---

[4] We borrow the word "revisable" from Professor Shane, who uses the term to refer to those executive branch determinations that are ordinarily within the discretion of the executive branch actor who makes them *See id*

agency generally need not investigate, and the agency is generally free to change course and halt the investigation if it later decides that continued investigation is unwarranted. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (discussing executive branch agency authority to revise regulations); *Heckler v. Chaney*, 470 U.S. 821 (1985) (discussing executive branch's enforcement discretion).

A settlement that purported to restrict the agency's future investigatory discretion, by, for example, requiring the agency to pursue a particular investigation, would, however, operate to transform the otherwise revisable exercise of executive branch discretion over investigations into a legally enforceable obligation to investigate. *See* Shane, *supra* at 245. The agency would have agreed to an enforceable settlement that would require it to undertake certain investigations that it would otherwise possess the statutory authority to forego as a matter of discretion. This memorandum focuses on settlements that have this type of consequence.

We note that, by way of contrast, many discretionary governmental decisions are not normally subject to revision once they have been made. We do not address settlements that contain promises to undertake such ordinarily non-revisable discretionary action, i.e., settlements that have the consequence of binding the government to adhere to the terms of a choice that, although itself discretionary, is ordinarily not subject to revision once it has been made. For example, a decision by the government to pay money to compensate a tort victim in a settlement does not constrain the exercise of revisable executive discretion as we use that concept here. Under ordinary principles of contract law, the government's initial decision whether it should pay money in return for the consideration that a plaintiff will terminate a suit is a discretionary one. The government's decision to make the promise to pay, however, is normally binding on the United States once it has been made and the consideration has been received in return. *See, e.g., Lynch v. United States*, 292 U.S. 571 (1934) (government contract binding); *Perry v. United States*, 294 U.S. 330 (1935) (same). A settlement to pay a tort victim money in consideration of the termination of the suit does not, therefore, constrain the executive branch's discretion to make the initial discretionary judgment as to whether the settlement should be effected. It constrains only the government's capacity to decline to provide a payment that it has, in its discretion, consented to make in return for the consideration that it has received from the other party to the settlement. As one commentator has noted, the "fact that a promise to pay damages arises in the specific contractual context of settling a lawsuit does not affect the ordinary status of the contracting decision as one that is nonrevisable." Shane, *supra* at 245.

In this respect, executive branch settlements that purport to bind the exercise of revisable policymaking discretion are distinct from ordinary executive branch tort settlements, just as government contracts purporting to constrain the exercise of regulatory authority are distinct from ordinary government supply contracts.

*See United States v. Winstar Corp.*, 518 U.S. 839, 913 (1996) (Breyer, J. concurring) (distinguishing between types of government contracts); *see* Jeremy A. Rabkin & Neal E. Devins, *Averting Government by Consent Decree: Constitutional Limits on the Enforcement of Settlements with the Federal Government*, 40 Stan. L. Rev. 203, 227 (1987) (discussing the analogy between government settlements and government contracts); *see also* Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295, 322–25 (same). As a result, we do not believe that ordinary tort settlements that take the form of a binding promise by the United States to pay money to a plaintiff in order to terminate a suit implicate the kind of separation of powers concerns that are identified by the Meese Policy.

We understand that settlements of the type identified in the Meese Policy typically arise when executive branch agencies are defendants. *See* Memorandum for the Associate Attorney General, from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, *Re: Department of Justice Policy Regarding Consent Decrees* at 1 (Nov. 1 1994) ("Patrick Memo"); *see also* Cooper Press Conference at 11–12. In some cases, however, they may also arise in government initiated actions. *See United States v. Board of Educ.*, 744 F.2d 1300, 1301 (7th Cir. 1984) (each party to the agreement assumed obligation to "make every good faith effort" to fund desegregation plan), *cert. denied*, 471 U.S. 1116 (1985); Patrick Memo at 4.

Finally, we note that the Meese Policy draws a distinction between the authority of the executive branch to enter into consent decrees, which are agreements that are formally entered as judicial orders, and the authority of the executive branch to enter into settlement agreements, which are merely contracts that are judicially enforceable. Thus, while the Meese Policy generally limits the settlement authority of the executive branch in the manner set forth above, it describes the limitations that apply to consent decrees differently from those that apply to settlement agreements. For example, the Meese Policy states that it is "constitutionally impermissible for the courts to enter consent decrees containing [certain discretion limiting provisions] where the courts would not have had the power to order such relief had the matter been litigated," but that the Attorney General retains plenary authority to enter into most settlement agreements "on terms that a court could not order if the suit were tried to conclusion." Meese Policy at 2. It appears that the distinction rests on the Meese Policy's conclusion that consent decrees are more constitutionally problematic than settlement agreements because they constitute judicial orders, entered by Article III courts, rather than merely contracts between the executive branch and another party, whether public or private, to the litigation.

In distinguishing between settlement agreements and consent decrees, the policy also states that Department attorneys should not become parties to consent decrees that limit executive discretion in a manner that would "unduly or improperly

constrain[ ] executive discretion'' if a similar limitation were imposed by injunction. Specifically, it states that Department attorneys should not enter into consent decrees that require a department or agency to revise, amend, or promulgate regulations where such actions would otherwise have been discretionary; to commit the department or agency to expend funds that Congress has not appropriated and that have not been budgeted for the action in question, or to seek a particular appropriation or budget authorization; or to divest the Secretary or agency administrator, or his successors, of discretion committed to him by Congress or the Constitution where such discretionary power was granted to respond to changing circumstances, to make policy or managerial choices, or to protect the rights of third parties. *Id.* at 3–4.

By contrast, the policy sets forth different limitations concerning settlement agreements. The policy states that Department attorneys should not enter into a settlement agreement that ''interferes with the Secretary or agency administrator's authority to revise, amend, or promulgate regulations through the procedures set forth in the Administrative Procedure Act;'' that commits the Department or agency to expend funds that Congress has not appropriated and that have not been budgeted for the action in question; that agrees to have the Secretary or agency administrator exercise his discretion in a particular way, where such discretion was committed to him by Congress or the Constitution to respond to changing circumstances, make policy or managerial choices, or protect the rights of third parties, unless the agreement makes revival of the suit the sole remedy for noncompliance. *See id.*

It is not entirely clear what substantive consequences are intended to follow from the difference in terminology that the Meese Policy uses in setting forth the rules that should apply to consent decrees as compared to settlement agreements. As we explain below, we do not believe that the distinction the Meese Policy draws between consent decrees and settlement agreements is of independent legal significance for purposes of determining the legal limits on discretion-limiting settlements except, perhaps, in rare cases. Nevertheless, where relevant to our analysis, we discuss the distinction that the Meese Policy draws between these two means of compromising litigation and how the distinction relates to federal constitutional and statutory restrictions on the authority of the executive branch to settle cases on terms that would limit the future exercise of executive branch discretion.

With these qualifications and clarifications in place, we now turn to a consideration of the general legal principles that define the limits of the Attorney General's power to effect the types of settlements that are at issue in the Meese Policy. After setting forth these general legal principles, we consider in Part IV how these general principles apply with respect to the types of settlements that are the subject of the Meese Policy.

## III. General Legal Principles

### A. The Source of the Attorney General's Settlement Authority

We begin by considering the source of the Attorney General's settlement power. The Office of the Attorney General is established by statute. Within broad constitutional bounds that are not directly relevant here, therefore, the Attorney General's power to settle litigation is defined, expressly or implicitly, by statute. *See Tenaska Washington Partners v. United States*, 34 Fed. Cl. 434, 440 (1995).[5] The Attorney General's settlement power is not expressly identified by statute, but it has long been understood to exist as an incident to the Attorney General's statutory authority to supervise litigation for the United States. *See Swift & Co. v. United States*, 276 U.S. 311 (1928); 28 U.S.C. §§ 516, 519 (1994); *Power of the Attorney General in Matters of Compromise*, 38 Op. Att'y Gen. 124, 126 (1934) (the authority "is in part inherent, . . . and in part derived from various statutes and decisions"); *Executive Bus. Media, Inc. v. United States Dep't of Defense*, 3 F.3d 759, 761–62 (4th Cir. 1993); *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992). "Included within this broad grant of plenary power over government litigation is the power to compromise and settle litigation over which the Attorney General exercises supervisory authority." *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 59 (1982). In addition, Executive Order No. 6166 transferred to the Department of Justice the powers of other agencies "to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense" of actions involving the United States. *See* Exec. Order No. 6166 (1933), *reprinted in* 5 U.S.C. § 901 note (1994).

The Attorney General's settlement power ordinarily attaches upon her receipt of a case and permits her to exercise broad discretion in determining when, and on what terms, settlement would best serve the interests of the United States. *See* 6 Op. O.L.C. at 59; *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976).[6] The settlement power is sweeping, but the Attorney General must still exercise her discretion in conformity with her obligation to "enforce the Acts of Congress." *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 55 (1980); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 609–13 (1838); *cf. Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dis-

---

[5] We do not consider in this memorandum the outer limits of Congress's constitutional authority to control the settlement discretion of the executive branch

[6] *See, e.g*, 28 U.S.C. § 2414 (1994) ("Except as otherwise provided by law, compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States, made by the Attorney General or any person authorized by him, shall be settled and paid in a manner similar to judgments in like causes . . ."), *Id.* § 2677 ("The Attorney General or his designee may arbitrate, compromise, or settle any claim cognizable under [28 U S C.] section 1346(b)     after the commencement of an action thereon ").

pensing power of [Executive] officials.''). Thus, the Attorney General must, as a general matter, exercise her broad settlement discretion in a manner that conforms to the specific statutory limits that Congress has imposed upon its exercise. *See Waiver of Statutes of Limitations in Connection with Claims Against the Department of Agriculture*, 22 Op. O.L.C. 127, 137–38 (1998).[7]

## B. Congressional Limitations on the Settlement Power

In addition to statutory limitations directly targeting the Attorney General's settlement power in particular, Congress may place limits on the scope of the Attorney General's settlement power through the general laws that govern the conduct of the agencies on behalf of which the Attorney General purports to settle. *See Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995); *Executive Bus. Media*, 3 F.3d at 762 ("[the settlement power] stops at the walls of illegality''); *Settlement Authority of the United States in Oil Shale Cases*, 4B Op. O.L.C. 756, 758 (1980); *Costle* Memo at 1–2. For example, the statutory requirement that the Department of Defense engage in competitive bidding has been held to preclude the Attorney General from settling a breach of contract claim by promising to award a Department contract outside the competitive bidding process, wholly apart from any concerns about the limitations such a settlement would impose upon the future exercise of executive branch discretion. *See Executive Bus. Media*, 3 F.3d at 762. Similarly, the United States Court of Appeals for the District of Columbia Circuit has explained that a federal statutory limitation on the applicability of the National Environmental Policy Act (''NEPA'') to a federal construction project would constrain the authority of the Attorney General to stipulate that the Secretary of the Interior would stay that project pending resolution of an environmental lawsuit. *See National Audubon Soc'y, Inc. v. Watt* 678 F.2d 299, 308 n.18 (D.C. Cir. 1982) (explaining that ''the general authority of the Justice Department over the conduct of . . . litigation . . . does not compensate for the Secretary's lack of authority under NEPA''). *See also Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1014 (7th Cir. 1984) (suggesting that consent decree limiting the investigatory authority of the Federal Bureau of Investigation may conflict with federal statutes that criminalize certain terrorist conduct).

When statutory limits on the scope of the Attorney General's settlement discretion are unclear, the Attorney General is presumed to have been authorized by Congress to settle on the terms that she determines would best serve the interests of the United States. *See Hercules*, 961 F.2d at 799 (holding that, since sections 122(a)–(f) inclusive of CERCLA do not apply to a cost recovery settlement, ''those provisions cannot be said to contain any clear and unambiguous limitation

---

[7] In rare cases, however, congressional directives regarding the exercise of executive power may be justifiably disobeyed on constitutional grounds. *See* 4A Op. O.L.C. at 55.

on the Attorney General's plenary ability to enter into settlements of cost recovery litigation''); 6 Op. O.L.C. at 59. The presumption in favor of a broad construction of the settlement power reflects the strong public interest in the swift resolution of burdensome litigation involving the United States, *see, e.g., Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 442 (9th Cir. 1989); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983), *cert. denied*, 467 U.S. 1219 (1984); 6 Op. O.L.C. at 59, as well as a recognition of the Attorney General's broad authority to control the conduct of litigation undertaken on behalf of the United States. Although Congress may restrict that authority through the imposition of statutory limitations on the conduct of the agency on behalf of which the settlement would be entered, it is important to emphasize that the agencies represented by the Attorney General are generally entitled to deference in construing the scope of ambiguous statutory restrictions on their conduct. *See Citizens for a Better Env't*, 718 F.2d at 1126; *SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) (deferring to Securities and Exchange Commission's construction of statutes governing decree); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); 6 Op. O.L.C. at 55 (explaining that "in exercising supervisory authority over the conduct of agency litigation, the Attorney General will generally defer to the policy judgments of the client agency. This deference reflects a recognition of the agency's considerable expertise in the substantive area with which it is primarily concerned.").[8]

In general, then, limits on the Attorney General's presumptively broad settlement power must take the form of clear statutory directives in order to be effective. *See, e.g, Utility Reform Project*, 869 F.2d at 443 (affirming settlement in which the administration agreed to halt construction of a nuclear power plant pursuant to statute conferring settlement authority upon the administration); *Hercules*, 961 F.2d at 798 (limits must be "clear and unambiguous"). Those limits may take the form, however, of not only targeted restrictions on the exercise of the settlement power itself but also restrictions on the conduct of the agency that incidentally serve to circumscribe the permissible terms of a settlement.

We emphasize, in this regard, that the statutory limitations on the Attorney General's settlement authority need not take the form of direct prohibitions against the exercise of that authority. The Attorney General generally possesses the congressionally conferred power to settle on terms that would serve the best interests of the United States, but the considerations and terms that inform and structure a settlement must be traceable, nonetheless, to a discernible source of statutory authority. We have explained that "[i]n deciding to settle or abandon

---

[8] At the same time, in many circumstances agencies are not free in the course of litigation to alter, amend, or adopt a regulatory interpretation of a statutory provision that governs their conduct Agencies may be required by the Administrative Procedure Act, for example, to adopt such an interpretation only through notice and comment rulemaking Thus, the Attorney General may be unable to rely on an agency's construction of an ambiguous statutory provision in circumstances in which, outside the settlement context, the agency would not be entitled either to adopt such an interpretation or to receive judicial deference for it.

a claim, or not to prosecute at all, the Attorney General is not restricted to consid-
erations only of litigative probabilities, but rather may make a decision, in his
discretion, on the basis of policies espoused by the Executive.'' 6 Op. O.L.C.
at 60. At the same time, however, we qualified this statement by explaining that
the President's constitutional obligation to ''take Care that the Laws be faithfully
executed'' necessarily serves to limit the exercise of the Attorney General's settle-
ment authority so that it does not become a dispensing power. *Id.*

As a general matter, certain considerations, such as litigation risk, are inherent
in a settlement power itself, and thus the authority to settle on the basis of such
considerations may be assumed to have been conferred by the statutes that serve
as the basis for the existence of the Attorney General's general settlement power,
namely the statutes that entrust the Attorney General with the supervisory
authority over litigation involving the United States. *See Compromise of Claims
Under Sections 3469 and 3229 of the Revised Statutes*, 38 Op. Att'y Gen. 94
(1933). Other types of considerations that concern more particular policy aims,
however, generally must be rooted in the purposes of the statutes that govern
the agency that has been vested by Congress with the policymaking discretion
and on whose behalf the settlement would be effected. It is the governing statutes
of the agency involved in the litigation, therefore, that in many instances must
provide the authority for a settlement. As we have previously explained in a
related context,

> [s]trictly speaking, ''policy'' judgments are confined to those sub-
> stantive areas in which the agency has developed a special expertise
> and in which the agency is vested by law with the flexibility and
> discretion to make policy judgments. However, it is increasingly
> the case that policy concerns are implicated in decisions dealing
> with litigation strategy, and in such cases, the Attorney General
> will accommodate the agency's policy judgments to the greatest
> extent possible without compromising the law, or broader national
> policy considerations.

*See 6 Op. O.L.C. at 55; Lars Noah, Administrative Arm-Twisting in the Shadow
of Congressional Delegations of Authority*, 1997 Wis. L. Rev. 873, 926 (''[T]here
is no inherent executive authority to settle cases on terms that have no connection
with the agency's statutory warrant.'') (quoting Marshall J. Breger, *Regulatory
Flexibility and the Administrative State*, 32 Tulsa L. J. 325, 338 (1996)).

In the end, the precise line that distinguishes a limitation on an administrative
agency's authority from a limitation that also applies against the Attorney Gen-
eral's power to settle litigation on an agency's behalf is necessarily imprecise.
In an earlier opinion, we explained that there is some ''tension'' between the
Attorney General's broad settlement power and the Attorney General's obligation

to enforce valid statutes. 4B Op. O.L.C. at 758. Under the broad settlement authority conferred upon the Attorney General, "it is reasonably clear that the Attorney General — in the exercise of his settlement responsibilities — is not bound by each and every statutory limitation and procedural requirement that Congress may have specifically imposed upon some other agency head in the administration of [the] agency's programs." *Id.* We further explained that "congressional requirements imposed on officials other than the Attorney General should not be thought to be directly [attributable] to him for the performance of his litigation function." *Id.* We went on to explain, however, that "Congress's will is surely not irrelevant to the Attorney General's discretion," *id.*, and that statutory limitations on the authority of an agency head may make it "reasonable to question whether the Attorney General's general litigation supervisory powers would give him a greater discretion." *Id.* at 758 n.2. We concluded, therefore, that "if there is a greater ambit of discretion, it must be located in Congress' actions in creating a centralized litigating department and clothing it with overriding authority to settle particular cases." *Id.*

As the settlement there in question had already been resolved, we declined to pursue the question any further at that time, other than to conclude that a settlement that would result in action "plainly at variance with Congress' intent" would be foreclosed and thus that a determination of the scope of the settlement power in particular cases must ultimately be made with attention to the specific statutes governing the activities that form the subject matter of the litigation. *Id.* at 758. That basic conclusion remains sound. The ultimate task is to arrive at a faithful determination of Congress's intent, taking into account both the purposes that underlie the Attorney General's statutorily conferred settlement power and the terms and purposes of the statutes that are relevant to the particular matter in litigation, including the statutes that limit the discretion of the agency on behalf of which the Attorney General would be entering into a settlement.

In addition to the limitations that Congress may place on the terms of settlements, Congress may also place limits on the kinds of claims that the Attorney General, as opposed to some other official, may settle, but these limits as well must be "clear and unambiguous." *See Hercules*, 961 F.2d at 798; 4B Op. O.L.C. at 756. These limits must be directed at the Attorney General's own settlement power, rather than the settlement power of other agency heads. Because Congress has entrusted the Attorney General alone with general supervisory power over litigation conducted on behalf of the United States, her settlement authority with respect to certain claims is presumed to remain even when Congress has expressly curtailed the settlement authority with respect to those same claims of some other executive branch official. *Id.* Thus, for example, a statute that prohibited the Secretary of the Treasury from settling certain tax claims was not thought to preclude

the Attorney General from settling those same claims. *See* 38 Op. Att'y Gen. at 94.[9]

### C. Constitutional Limitations on the Settlement Power

Even when Congress has authorized the Attorney General to settle litigation on terms that would limit the future exercise of executive branch discretion, the Constitution may prevent her from doing so. Most obviously, basic constitutional restrictions on governmental action, whether or not such action is taken in the context of a litigation settlement, constrain the Attorney General's exercise of her settlement discretion. Thus, for example, she may not enter into a decree that would require unconstitutional governmental action in violation of the rights of private parties or the structural prerogatives of the states. *Cf. Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986) (explaining that consent decree mandating affirmative action plan would have to conform to the Equal Protection Clause).

In addition, the Constitution places particular limitations on the authority of the Attorney General to enter into judicially enforceable settlements that would limit the exercise of executive branch discretion. These limitations inhere in (1) the constitutional limitations that are rooted in both the general executive power that Article II of the Constitution vests in the President and that may constrain, in extreme cases, the executive branch's authority to adopt enforceable limitations on the future exercise of congressionally conferred executive discretion, as well as the specific discretionary powers that Article II confers directly upon the President, such as the power to recommend legislation to Congress and (2) the restrictions that Article III imposes on the power of federal courts to enforce certain types of executive branch settlements that are otherwise constitutionally permissible. We consider below each of these types of constitutional limitations on the executive branch's power to enter into judicially enforceable settlements.

1. *Article II Limitations on the Attorney General's Settlement Authority.* It is important to distinguish between two types of executive branch settlements, each of which derives from one of the two sources for executive branch power: the power vested in the executive branch by Congress pursuant to statute and the

---

[9] In concluding that the Attorney General's authority to settle on terms that would limit the future exercise of congressionally conferred executive discretion must be rooted in a statutory grant of power, we do not address the distinct question of the degree to which the constitutional separation of powers would permit the Congress to circumscribe the Attorney General's authority to decline to pursue an enforcement action in the first instance (or to dismiss such an action after it has been commenced). *See* Memorandum for Abbot B. Lipsky, Jr., Deputy Assistant Attorney General, Antitrust Division, from Larry L Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Applying the Tunney Act or Similar Legislation to Dismissals by the United States of Civil Antitrust Actions* (June 7, 1983) (discussing potential separation of powers issues raised by legislation that would circumscribe the Attorney General's authority to dismiss antitrust suits) A limitation of this type would constitute a direct infringement of the discretion that the executive would choose to exercise if permitted to do so, while settlements of the type at issue here concern the judicial enforcement of limitations that the executive has voluntarily agreed to assume

power vested in the executive branch by the Constitution directly. *See Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring). First, there are settlements that purport to limit the future exercise of the discretion that Congress has conferred upon the executive branch pursuant to statute. Settlements of this type are generally permissible but may in extraordinary cases implicate structural limitations regarding the authority of the executive branch to divest itself of the administration of federal law. Second, there are settlements that purport to limit the future exercise of the discretion that the Constitution itself, by virtue of Article II, commits to the executive branch without regard to whether there has been a congressional delegation of authority. *See* Shane, *supra* at 255. Settlements of this type are generally impermissible.

(a) *Settlements That Limit Congressionally Conferred Executive Branch Discretion.* In general, Congress may define the scope of the discretion that it authorizes the executive branch to exercise without infringing upon the constitutional separation of powers between the legislative and executive branches. *See Heckler v. Chaney*, 470 U.S. 821, 833 (1985); *see also Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in . . . operative statutes"). Because Congress may, within broad constitutional boundaries, define the scope of the discretionary authority that it confers upon the executive branch, *see Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (holding that it is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it. and the boundaries of th[e] delegated authority") (citation omitted), it possesses the power to confer upon the executive branch the authority to settle litigation on terms that place limits upon the exercise of that discretion. As one commentator has explained,

> constraints on executive authority to limit discretion that has been vested in the executive by statute are themselves essentially statutory and must be determined with reference to legislative intent. The discretion subject to limitation is discretion delegated by Congress, at *its* discretion. Whether the President may compromise discretion Congress has so vested is likewise a matter within Congress's power to decide.

Shane, *supra* at 255.

The constitutional requirement that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, is consistent with the conclusion that Congress may authorize the Attorney General to settle litigation on terms that place limits on the future exercise of congressionally conferred executive branch discretion. The Take Care Clause "simply requires the President to 'take Care' that whatever valid legal requirements might exist are followed." *Binding*

*Arbitration*, 19 Op. O.L.C. at 224. It· does not, in and of itself, affect the power· of the Attorney General to limit the exercise of discretion conferred by Congress, when Congress grants her the broad power to do so through settlement, and no independent constitutional provision stands as an obstacle. *Id.* (reaching the same conclusion with respect to the government's power to submit to binding arbitration in the absent of either a statutory command to do so or a statutory prohibition against doing so). Therefore, to the extent that the Constitution imposes restrictions on executive branch settlements that limit the exercise of congressionally delegated discretion, the Take Care Clause is not the basis for those limitations. Those limitations must be found elsewhere.[10]

Notwithstanding the broad power that Congress possesses to authorize the executive branch to limit its statutorily conferred discretion through an enforceable settlement, Article II, which vests the executive power in the President, and considerations of the constitutional structure may in extraordinary cases give rise to concerns about congressionally authorized executive branch settlements that restrict the exercise of such discretion. As a practical matter, it is unlikely that it will be necessary to consider these possible constitutional limitations, as Congress will rarely, if ever, authorize the executive branch to settle on terms that would divest itself of the kind of administrative authority over federal law that it might be constitutionally required to maintain. Certainly a general conferral of settlement authority would not suffice to authorize an irrevocable divestment of the kind of significant policymaking authority that, as a conceptual matter, would raise constitutional concerns.

In circumstances where a settlement that would effect such a divestment is contemplated, some guidance as to the proper constitutional analysis may be drawn from the precedents that concern the constitutionality of statutory provisions that interfere with the general separation of powers principle, which precludes one branch from unduly interfering with the ability of another branch to perform its constitutionally assigned functions. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977); *The Constitutional Separation of Powers*, 20 Op. O.L.C. at 133–35.[11] This general principle, in certain circumstances, may constrain the authority of Congress to delegate the administration of federal law to non-execu-

---

[10] Because Article III judges are not congressional agents, Congress does not confer power on itself or its agents when it authorizes the Attorney General to settle litigation in federal court on certain terms *Cf Binding Arbitration*, 19 Op. O L.C. at 225 (discussing constitutional limits on Congress's power to exercise continuing control over an arbitrator). It merely authorizes the executive branch to execute the laws — namely, the laws conferring settlement discretion — free from congressional control and in accord with judicially enforced limitations. Accordingly, statutes that confer settlement power upon the Attorney General do not implicate the anti-aggrandizement principle, which "forbids Congress, directly or through an agent subject to removal by Congress, from intervening in the decision making necessary to execute the law " *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O L.C 124, 131 (1996) (footnote omitted) (*"The Constitutional Separation of Powers"*) Such statutes merely authorize the executive branch to exercise discretion in a manner that may invite judicial supervision. As we discuss below, however, the enforcement of such settlements may, in certain instances, constitute impermissible exercises of the judicial power conferred on the federal courts by Article III.

[11] We do not address here the extent to which the general separation of powers principle, as applied as a constraint on limitations on executive power, is rooted in part in the Take Care Clause.

tive branch actors because such delegations, like restrictions on the removal power, may undermine the executive branch's ability to perform its constitutionally assigned functions with respect to the administration of federal law. *See id.* at 176–77. The general separation of powers principle does not bar delegations of this type as a general matter, but it may do so in circumstances in which "a congressional delegation of authority to non-federal officials or to private parties might have a significant impact on the executive branch's ability to fulfill its constitutional functions." *Id.* at 177 (discussing delegations to actors outside the federal government that have been made pursuant to congressional mandates); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down congressional delegation to industry group); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (same); Rabkin & Devins, *supra* at 225 (explaining that "[w]here Congress has . . . vested responsibility in an executive program, directly parallel constitutional objections would surely apply to any effort to subdelegate this . . . responsibility to private parties.").[12]

In an extraordinary case, a legally enforceable settlement could be said to have a similarly significant impact on the executive branch's ability to fulfill its constitutionally assigned functions. Some settlements that irrevocably conferred substantial administrative discretion to determine the substance of federal regulations affecting the conduct of third parties could, for example, raise constitutional concerns as the other party to the settlement would not be under the executive branch's control. Thus, the vesting of the executive power in the President, as well as more general principles of constitutional structure, raise concerns about the constitutionality of binding settlements that would have the consequence of delegating to non-executive branch actors substantial administrative discretion of a type that Congress could not itself delegate to actors wholly outside the executive branch's control. In this respect, the general settlement power of the Attorney General should not be construed to authorize the kind of extraordinary settlements that would implicate these constitutional concerns.

Even apart from constitutional concerns that relate to the executive's administration of the laws that Congress has enacted, settlements of this type may also raise independent concerns under the Due Process Clause. For example, such concerns may be presented to the extent that such settlements would preclude third parties from receiving notice of, or commenting upon, substantive regulations that the United States would agree in the settlement to promulgate and that would have an "immediate and direct affect on [the third party's] activities" prior to their adoption. *See Environmental Defense Fund, Inc. v. Costle*, 636 F.2d 1229, 1257

---

[12] This office is no longer of the view that the Appointments Clause prohibits the delegation of rulemaking authority to private groups as a general matter, *see The Constitutional Separation of Powers*, 20 Op. O.L.C. at 142 & n 52, although prior opinions of this office had reached that conclusion. *See, e.g., Constitutional Limits on "Contracting Out" Department of Justice Functions Under OMB Circular A–76*, 14 Op O L C 94 (1990). We now believe that such delegations are more properly considered as implicating the general separation of powers principle *See The Constitutional Separation of Powers*, 20 Op O.L.C. at 176–77

(D.C. Cir. 1980). These concerns are heightened when the settlement, by granting a private party an enforceable right to direct the regulatory discretion of the executive branch, effectively authorizes one industry to regulate its competitors. *See, e.g., Carter Coal,* 298 U.S. at 311. The serious constitutional concerns such extraordinary settlements raise provide an additional basis for construing the scope of the present settlement power to preclude such settlements. *See The Constitutional Separation of Powers,* 20 Op. O.L.C. at 178 (discussing canon of narrow construction to avoid separation of powers issues); *cf. United States v. Winstar Corp.,* 518 U.S. 839, 913 (1996) (Breyer, J., concurring) (explaining that "[t]he simple fact that it is the Government may well change the underlying circumstances, leading to a different inference as to the parties' likely intent — say, making it far less likely that they *intend* to make a promise that will oblige the government to hold private parties harmless in the event of a change in the law) (emphasis added).

Notwithstanding the limitations that Article II and the Due Process Clause may impose upon the executive settlement power in certain extreme cases, Congress's general power to authorize the executive branch to settle litigation on terms that would limit the exercise of congressionally conferred executive branch discretion is broad. Indeed, it extends even, as a constitutional matter, to permit Congress to authorize a present administration's executive branch to enter into a settlement that would bind a subsequent administration's exercise of that same statutorily conferred executive discretion. *See* Robert V. Percival, *The Bounds of Consent: Consent Decrees, Settlements and Federal Environmental Policy Making,* 1987 U. Chi. Legal F. 327, 344.[13] Just as Congress may authorize an agency to enter into a settlement that would govern the mode of enforcement of a particular statute for six months, it may authorize an agency to agree to a settlement that would govern the mode of enforcement for six years. In either case, Congress would have simply authorized the agency to limit the future exercise of congressionally conferred executive discretion. And because the limitation would apply only to discretion that Congress had itself conferred, the limitation would in no way infringe upon the executive's constitutional power. "If the laws Congress passes enable one president to curtail the enforcement discretion of later administrations, and a president invokes such authority, then later administrations, implementing their curtailed discretion, are faithfully executing the laws, as Congress has enacted them; no constitutional power has been lost." *See* Shane, *supra* at 291 n.181.

---

[13] Some commentators have suggested that a contrary rule follows from *INS v Chadha,* 462 U S. 919, 947 (1983), in which the Court permitted President Reagan to challenge the constitutionality of a legislative veto provision that President Kennedy had signed into law. *See, e g.,* Rabkin & Devins, *supra* at 219–20 (citing other similar cases as well) *Chadha* supports only the more limited proposition that one administration may not sign unconstitutional legislation and thereby preclude subsequent administrations from challenging that law's constitutionality. Thus, while *Chadha* helps to explain why settlements that unconstitutionally constrain a present administration may not bind a subsequent one, it does not address whether settlements that permissibly constrain a present administration may constitutionally bind a subsequent one.

That an agreement of this type would extend beyond the duration of the present administration would not appear to be of independent constitutional significance. Numerous exercises of executive discretion that are made pursuant to congressional authority limit the scope of congressionally conferred discretion and bind subsequent administrations. *See Winstar*, 518 U.S. at 872–73 (holding United States liable for prior promises to bear costs of regulatory change made by executive branch agency officials) (opinion of Souter, J.); *id.* at 876 (explaining that "it is clear that the National Government has some capacity to make agreements binding future Congresses by creating vested rights"); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810); Percival, *supra* at 344 ("By necessity, executive agencies undertake many actions that have a profound impact on the policy choices available to future administrations."). The critical point is that such agreements serve to circumscribe and define the enforcement discretion that Congress itself has delegated, not to diminish the executive power that the Constitution has committed to the executive branch.

It should be acknowledged, however, that the Supreme Court's general statements regarding the authority of Congress to bind the future exercise of Congress's legislative discretion have appeared in cases that have involved claims for damages that have resulted from the enactment of subsequent legislation rather than in cases that have involved claims for injunctions against the enforcement of such subsequent legislation. The Court has stated that a present Congress may authorize action that will incur financial obligations that will be borne far into the future, thereby limiting the future lawmaking discretion of Congress in some respects. It has also made reference in several cases, however, to what it has termed the "reserved powers" doctrine, "which [has] held that certain substantive powers of sovereignty could not be contracted away." *Winstar*, 518 U.S. at 874 (opinion of Souter, J.). As Justice Souter recently explained, this general doctrine "has always lived in some tension with the constitutionally created potential for a legislature, under certain circumstances, to place effective limits on its successors or to authorize executive action resulting in such a limitation." *Id.* at 873.

The reserved powers doctrine may be traced to early cases in which the Supreme Court confronted claims that the state legislature had, through subsequent legislation, purported to abrogate apparent state promises to exempt certain private parties from the future application of state regulatory power. In the course of rejecting the Contracts Clause claims of these private parties, the Supreme Court concluded that state legislatures lacked the power to contract away certain of their state powers. *See, e.g., Stone v. Mississippi*, 101 U.S. 814 (1879) (state may not contract away its police power). The reserved powers doctrine has not been applied directly against the federal government to invalidate federal legislation, but, as we have mentioned, Justice Souter's opinion in *Winstar* recently invoked the doctrine in construing a promise that had been made by a federal regulatory agency so as not to limit the future power of Congress to subject private parties to newly

imposed regulatory requirements. *See Winstar*, 518 U.S. at 873–74 (opinion of Souter, J.).

The reserved powers doctrine would not appear to preclude the executive branch from making a judicially enforceable promise that would limit the future exercise of congressionally conferred *executive* discretion. Such a promise would not itself bind the legislature; it would merely set forth a limitation on the discretion that the executive branch could exercise pursuant to its then applicable statutory authority. Thus, the consent by an agency to an enforceable limitation on the future regulatory authority of that agency would not, absent independent constitutional limitations that may be imposed by the Due Process or Takings Clauses, limit the ability of Congress to enforce regulatory measures pursuant to a subsequent legislative measure. Indeed, there would be compelling reason to doubt, in the absence of a clear indication to the contrary, that an executive branch agency would be authorized to promise that a particular party would be free from a future, congressionally mandated regulatory change.

Finally, we note that, although there is no general bar to executive branch settlements that limit the future exercise of congressionally conferred executive branch discretion, courts often construe the actual terms of executive branch settlements narrowly on the assumption that they are not intended to bind subsequent administrations and out of respect for executive branch prerogatives. *See, e.g., Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) (explaining importance of narrow constructions of decrees that bind the exercise of governmental discretion), *cert. denied*, 511 U.S. 1082 (1994); *Alliance to End Repression v. City of Chicago*, 742 F.2d at 1013 (explaining that ''a court will hesitate to assume that by signing a consent decree the government knowingly bartered away important public interests merely to avoid the expense of a trial''). Indeed, the Supreme Court suggested in *Rufo v. Inmates of Suffolk County Jail* that the fact that a new administration had taken office was generally relevant to a determination whether a consent decree limiting governmental discretion may be modified. *See* 502 U.S. 367, 383 (1992).

In this respect, the interpretive practice comports with the rules that apply to government contracts generally. The practice is rooted in an assumption about the government's likely intentions in settling litigation, rather than in a conclusion about the scope of the executive branch's constitutional authority to settle litigation in a manner that limits the future exercise of its statutorily vested discretion. *Cf. Winstar*, 518 U.S. at 913 (Breyer, J., concurring) (explaining that ''[t]he simple fact that it is the government [that is a party to the agreement] may well change the underlying circumstances, leading to a different inference as to the parties' likely intent — say, making it far less likely that they *intend* to make a promise that will oblige the government to hold private parties harmless in the event of a change in the law''). This interpretive practice, however, indicates that settlements that are intended to contain commitments of substantial duration should

make that intention manifest, assuming, of course, that such unusual commitments are authorized.

(b) *Settlements That Limit Constitutionally Conferred Executive Branch Discretion.* Settlements by the Attorney General that purport to resolve litigation on terms that would limit the exercise of discretion that the *Constitution* itself confers upon the executive branch raise different constitutional questions from those presented by settlements that purport to limit the exercise of congressionally conferred discretion. In addition to vesting the general executive power in the President, which, as we have seen, may result in limitations on the executive branch's power to settle litigation on terms that would result in open-ended delegations of administrative authority over federal law to non-executive branch actors, Article II also vests certain more specified powers directly in the President, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and commits their exercise to the President's unfettered discretion. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 486 (1989) (Kennedy, J., concurring) (distinguishing between these two types of executive power). An analysis of the expressly named discretionary functions that, in addition to the vesting of the executive power itself, the Constitution commits to the President is beyond the scope of this memorandum. As we discuss below, however, the President's power to make recommendations to Congress is among them. *See Memorandum Regarding Delegation of Presidential Functions* at 32 (Sept. 1, 1955) ("Delegation Memo"); *see also Binding Arbitration*, 19 Op. O.L.C. at 226 (discussing pardon, Commander in Chief, and foreign affairs powers).Congress need not act in order for the President to exercise such constitutionally vested discretionary powers, and it is powerless to restrict the President's discretionary exercise of them. *See, e.g., Schick v. Reed*, 419 U.S. 256, 266 (1974) (explaining that the pardon power "flows from the constitution alone . . . and . . . cannot be modified, abridged, or diminished by the Congress"). In vesting these discretionary powers in the President, the Constitution necessarily precludes the Attorney General from settling litigation on terms that would require that their exercise comply with the terms of a binding settlement. *See* Memorandum for Michael J. Horowitz, Counsel to the Director and General Counsel, Office of Management and Budget, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Chicago School Case* at 15–16 & n.9 (Aug. 6, 1984) (*"Chicago School Case"*) ("The essence of such non-delegable functions is that the President alone retains, and must constitutionally retain, the discretion to perform them."). Such a settlement would authorize a private party or the courts to constrain the exercise of the very unfettered discretion that the Constitution has vested in the President, and thus the very discretionary character of those constitutionally vested powers precludes the executive branch from entering into a settlement that would constrain their otherwise unfettered future exercise. *See generally* Delegation Memo at 28. As a result, Congress may not authorize the executive branch to settle litiga-

tion on terms that would interfere with the exercise of such non-delegable, constitutionally-committed executive discretion.

2. *Article III Limitations on the Settlement Power.* Article III provides that "[t]he judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *See* U.S. Const. art. III, § 1. Article III federal courts may not enforce unauthorized executive branch settlements, and, for that reason, the scope of the Attorney General's settlement power, as defined by both statutory and constitutional limitations, necessarily limits the enforcement power of federal courts. *See Costle* Memo at 2 (explaining that "one must first determine what the agency itself has authority to do in the way of agreeing or consenting to limitations on its own power"); *cf. Winstar,* 518 U.S. at 891–92 (considering whether agency had the statutory authority to enter into a contract that had been allegedly breached).

Even when the Attorney General has been authorized statutorily and constitutionally to settle litigation in a manner that limits the exercise of executive branch discretion, Article III may place independent limits on the power of Article III federal courts to enforce those settlements. The Meese Policy suggests that this is the chief limitation that applies to the Attorney General's use of consent decrees — as opposed to settlement agreements — that limit executive branch discretion. The Meese Policy apparently assumes that Article III prohibits an Article III federal court from entering a consent decree of this type unless the court could have imposed an ordinary injunction that would have imposed the same limitations on the exercise of executive discretion. *See* Cooper Press Conference at 8 ("Our position is, obviously, that no judge can or no judge's powers are enhanced by the agreement of the parties before him. His powers are limited, in a consent decree, to those that . . . he or she could exercise in a litigated decree. You can't go beyond it. And that is, I guess, one of the fundamental premises of these consent decree guidelines."). It therefore states that "[a] department or agency should not limit its discretion by consent decree where it would assert that a similar limitation imposed by injunction unduly or improperly constrains executive discretion." Meese Policy at 3. This aspect of the Meese Policy apparently rests on the view that consent decrees, as enforceable court orders, must, by reason of Article III, necessarily be more limited in scope than settlement agreements, which are merely a species of contract.

After the Meese Policy was issued, however, the Supreme Court set forth a more expansive conception of the permissible scope of consent decrees than the one on which the Meese Policy apparently rests. *See Local 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501 (1986). While acknowledging that federal courts are not mere " 'recorder[s] of contracts' from whom parties can purchase injunctions[,]" *id.* at 525 (citation omitted), the Court explained that it is the parties' agreement, "rather than the force of the law upon which the

complaint was originally based, that creates the obligations embodied in a consent decree." *Id.* at 522. As a result, *Firefighters* held that consent decrees were distinguishable from ordinary injunctions, and that Article III federal courts could use consent decrees to provide "broader relief than [courts] could have awarded after a trial." *Id.* The Court ruled that so long as an agreement between parties resolves a dispute within the court's subject matter jurisdiction, comes within the general scope of the case made by the pleadings, furthers the purposes of the law on which the complaint is based, and does not otherwise violate federal law, it may be entered as a consent decree even though its terms could not have been included in an ordinary injunction and even though the decree itself has the force of a court order. *See id.* at 525–26.

The Supreme Court reaffirmed *Firefighters* in *Rufo*, another case decided after the Meese Policy had been issued. In setting forth the legal standard that governs consent decree modification, the *Rufo* Court explained that a consent decree may provide relief in excess of what a court could impose absent party consent:

> Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. *See Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 281 (1977). But we have no doubt that, to 'save themselves the time, expense, and inevitable risk of litigation,' *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971), petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a direction to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement.

502 U.S. at 389. Together, *Firefighters* and *Rufo* reaffirm the essential portions of the longstanding rule that "[p]arties to a suit have the right to agree to any thing they please in reference to the subject-matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings." *Pacific R.R. v. Ketchum*, 101 U.S. 289, 297 (1879).

Although both *Rufo* and *Firefighters* involved decrees that limited state and local governmental discretion, rather than federal executive branch discretion, we do not believe that this distinction is of consequence for purposes of determining the limits that inhere in Article III. In upholding the decree in *Firefighters*, the Court approvingly cited the D.C. Circuit's opinion in *Citizens for a Better Environment, see Firefighters*, 478 U.S. at 525, which expressly rejected the contention that the Constitution prohibits a consent decree — but not a settlement

agreement — from imposing limits on executive branch discretion unless the same limits could have been imposed by injunction after trial. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126–29 (D.C. Cir. 1983). Other courts of appeals have concurred in this conclusion with respect to settlements by the federal government. *See, e.g., Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) (approving consent decree involving Department of Health and Human Services); *Turner v. Orr*, 759 F.2d 817 (11th Cir. 1985) (approving consent decree involving Secretary of the Air Force), *cert. denied*, 478 U.S. 1020 (1986); *Sansom Committee v. Lynn*, 735 F.2d 1535, 1540 (3d Cir.) (approving consent decree involving Department of Housing and Urban Development), *cert. denied*, 469 U.S. 1017 (1984). Thus, we do not believe that Article III prohibits a federal court from entering a consent decree that provides broader relief than the court could have ordered in the absence of consent, even when the terms of the decree would limit the exercise of executive branch discretion.

Nor do we believe that the judicial enforcement of a term of a settlement, whether such term is contained in a consent decree or a settlement agreement, is beyond the powers of an Article III court whenever such enforcement would take the form of an injunction that could not have been imposed in the absence of a settlement. The Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978), is not inconsistent with this conclusion. In *Vermont Yankee*, the Court held that Article III federal courts were barred, for separation of powers reasons, from imposing rulemaking procedures upon executive branch agencies that go beyond those procedures that Congress had required the agency to obey. *Id.* at 524–25. The Court did not address, however, the distinct question whether federal courts were similarly precluded from requiring executive branch agencies to adhere to the terms of settlements that they had voluntarily entered into in order to resolve litigation.

Outside the settlement context, lower federal courts have held that *Vermont Yankee* does not apply to bar the judicial enforcement of a procedure that an agency has voluntarily adopted in the exercise of its administrative discretion so long as there is some independent legal limitation on the agency's authority to deviate from that procedure once it has been adopted. *See, e.g., USAir, Inc. v. Department of Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992). Under these decisions, Article III courts may, consistent with *Vermont Yankee*, preclude an agency from deviating from a procedure even though Congress has not mandated that the agency adopt such a procedure in the first instance. So long as Congress has authorized an agency to exercise its discretion in a manner that imposes new procedural obligations upon it, and has precluded the agency from divesting itself of those obligations without following certain independent, statutorily-prescribed procedures, a federal court may hold the agency to the procedures that it initially adopted as a matter of discretion until such time as it has withdrawn those proce-

dural requirements in the manner that Congress has prescribed. *See International Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (explaining that the Administrative Procedure Act requires agencies to adhere to procedural rules which they adopt even when those rules are not themselves required by statute).

This same logic indicates that when agencies consent to settlement terms that accord with statutory limitations but compel them to exercise their statutorily conferred discretion in the absence of any statutory mandate to do so, no Article III problem of the type identified in *Vermont Yankee* arises from the fact that the settlement thereby empowers a federal court to hold the agency to its voluntarily assumed obligations in a manner that comports with the applicable statutes. *See Citizens for a Better Env't*, 718 F.2d at 1127–29, *Costle* Memo at 5–6. The rationale for this conclusion rests on the essential distinction for separation of powers purposes between the judicial enforcement of a voluntarily assumed, and congressionally authorized, executive branch obligation and the judicial imposition of an executive branch obligation that the agency has not assumed and that Congress has not required it to assume. In other words, the rationale rests on the very distinction between consent decrees and injunctions that the Court described in *Firefighters. See, e.g., Citizens for a Better Env't*, 718 F.2d at 1128 ("'manifestly the requirements imposed by the Decree do not represent judicial intrusion into the Agency's affairs to the same extent they would if the Decree were 'a creature of judicial cloth' '") (quoting *Weinberger v. Catholic Action of Hawaii/ Peace Educ. Project*, 454 U.S. 139, 141 (1981)); *see Costle* Memo at 5–6.

Moreover, the judicial enforcement of executive branch settlements that purport to limit the exercise of executive branch discretion generally do not conflict with the Article III rule that "[q]uestions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government." *Green v. Frazier*, 253 U.S. 233, 240 (1920). This general limitation on Article III federal court power serves to prevent a federal court from compelling an executive branch entity to exercise the discretion that Congress has conferred in a particular manner by, for example, imposing a procedural requirement upon an agency that Congress has not itself imposed. An Article III federal court ordinarily lacks the authority — in the absence of a contrary constitutional imperative, such as the requirement of due process of law — to make the policy determination regarding the procedures that an agency should adopt both because Congress has delegated the discretion to make such determinations to the agency and because of the discretionary nature of the determination. *See Vermont Yankee*, 435 U.S. at 524–25.

This general limitation on the power of Article III federal courts does not, however, suffice to prevent the judicial enforcement of a procedural requirement with which an agency has agreed to comply in a consent decree or settlement agreement. The enforcement of a requirement contained in a settlement generally will

not require an Article III federal court to make a policy judgment regarding the merits of that requirement. Enforcement of such a requirement will merely require an Article III federal court to perform its core function of enforcing a congressionally authorized limitation on executive branch policymaking discretion — namely, the limitation that the executive branch agency has itself adopted, in the exercise of its statutorily conferred discretion, through its consent to the requirement contained in the decree or settlement agreement. In this respect, the judicial enforcement of settlement terms does not differ for purposes of Article III's restriction on the authority of federal courts to decide "questions of policy" from the judicial enforcement of statutory limits on executive branch discretion. *See Berger*, 771 F.2d at 1579 (comparing consent decree requiring agency to issue regulations to injunction requiring agency to redraft regulations to bring them into compliance with statute).

As we have suggested, however, Article III does place independent limits on the power of Article III federal courts to enforce executive branch settlements in some circumstances. *Cf. Morrison v. Olson*, 487 U.S. 654, 680–81 (1988) (Article III judges "may not encroach upon executive or legislative authority or undertake tasks that are more properly accomplished by those branches."); *Buckley v. Valeo*, 424 U.S. 1, 123 (1976) (Article III courts may not exercise "executive or administrative duties of a nonjudicial nature."). For example, executive branch settlements may not be enforced if their terms lack judicially-discoverable and manageable standards for enforcement, *cf. Baker v. Carr*, 369 U.S. 186, 217 (1962) (discussing political question doctrine), or depend upon the enforcing court to make "an initial policy determination of a kind clearly for nonjudicial discretion." The precise nature of these limits are unclear, and we are not aware of any settlements that the Supreme Court has deemed unenforceable as a consequence of these ill-defined limits. *See, e.g.*, William A. Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy*, 91 Yale L.J. 635 (1982); Robert F. Nagel, *Separation of Powers and the Scope of Federal Equitable Remedies*, 39 Stan. L. Rev. 661 (1978).[14]

Some guidance as to the types of judicial judgments that would transgress the limitations on the judicial power that are imposed by Article III may be found in our opinion on the constitutional concerns that arose in the context of a pro-

---

[14] The D.C. Circuit recently expressed concern that the general and amorphous "public interest" standard that the Tunney Act, 15 U.S.C. § 16(e) (1994), instructs courts to apply in reviewing the United States' authority to enter proposed consent decrees for the resolution of antitrust suits violates Article III. *See United States v Microsoft Corp.*, 56 F.3d 1448 (D.C Cir 1995) (concluding that judicial rejection of consent decree under the "public interest" standard violated the Tunney Act and that a contrary interpretation of the judicial authority conferred by the Act would raise substantial Article III concerns), *see also Maryland v. United States*, 460 U.S 1001 (1983) (Rehnquist, J., joined by Burger, C J., and White, J., dissenting), *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O L C 207, 219 n.7 (1989) (noting that there are "very serious doubts as to the constitutionality" of the Tunney Act because it "intrudes into the executive power and requires courts to decide" policy questions normally reserved for the political branches); *but cf Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S 129, 141 (1967) (rejecting antitrust "settlement" after noting that the Department of Justice had "knuckled under"); *United States v. CIBA Corp*, 50 F.R.D 507 (S.D N.Y. 1970) (reviewing post-*Cascade* cases)

posed modification to a consent decree that the Attorney General had entered into in an antitrust suit. *See* Memorandum for Kenneth G. Starling, Deputy Assistant Attorney General, Antitrust Division, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legal Implications of Antitrust Division's Failure to Accede to Judge's Requested Modification of Antitrust Consent Decree* at 11 (May 4, 1988). Among the types of judgments that we identified in that opinion as constitutionally problematic for an Article III court to make were "weighing the relative merits of imposing particular side-conditions vis-a-vis formulating alternative consent decree proposals for judicial consideration; determining what the benefits (or costs) of further prosecution would be; assessing how particular strategies may enhance the effectiveness of antitrust enforcement and aid the Executive Branch's overall policies and programs; and determining how the Government's limited law enforcement resources may best be used." *Id.* We note as well that the Supreme Court has suggested that it would transgress the bounds of Article III for federal courts to "supervise" the prosecutorial discretion of the executive branch. *See Morrison,* 487 U.S. at 681 (upholding the Independent Counsel Act and noting that it did not confer upon the federal courts "the power to 'supervise' the independent counsel in the exercise of his or her investigative or prosecutorial authority").

These limitations on the scope of an Article III court's authority were identified, however, in connection with the consideration of statutory provisions that conferred authority upon Article III federal courts either to limit the executive branch's power to modify a decree or to exercise some measure of control over appointment and removal of the independent counsel. Here, by contrast, we are concerned with the authority of Article III courts to review and enforce the terms of settlements entered into by executive branch actors pursuant to the exercise of their congressionally conferred authority. It is conceivable that Article III federal courts would have somewhat greater authority in the context of enforcing the terms of a settlement that the executive branch had itself consented to enter. Nevertheless, the executive branch surely has no power to expand the types of questions that an Article III court may resolve to include the resolution of policy questions that are not ordinarily susceptible of judicial determination. As a general matter, therefore, settlements that confer upon federal courts the broad authority to determine whether executive branch enforcement action has met some general standard, as opposed to whether it has satisfied a specific promise to undertake previously specified action, would raise Article III concerns.

Of course, litigation compromises that would require Article III judges to make the kind of determinations in the course of enforcing their terms that would press the bounds of Article III also would likely raise substantial constitutional concerns independent of the limitations imposed upon the exercise of the judicial power by Article III. As we have explained, settlements that contain terms that authorize Article III judges to make discretionary determinations in the course of the exer-

153

cise of their enforcement powers may be objectionable as impermissible delegations of executive branch authority under Article II. *Cf. The Constitutional Separation of Powers*, 20 Op. O.L.C. at 176–77 (discussing delegations to actors outside the federal government that have been made pursuant to congressional mandates). Settlements that contain such open-ended terms potentially confer too much authority over the exercise of congressionally conferred executive authority upon the non-executive branch actors with whom the settlement is effected, and for that reason could be constitutionally suspect without regard to the limitations that Article III places on federal court enforcement. *Id.*

Notwithstanding the Article III limitations described above, executive branch settlements that limit the future exercise of congressionally conferred executive discretion do not necessarily, or even generally, require Article III federal courts to make constitutionally suspect policy judgments in enforcing their terms. Generally, the judiciary is simply called upon to enforce a clear limitation that the executive branch has voluntarily adopted, in much the same manner that the judiciary may be called upon to enforce either an administrative procedure that an agency has agreed, in its discretion, to be bound by, or a clear statutory limitation that has been imposed upon an executive branch actor's discretion. Moreover, out of respect for the limits that Article III imposes on the judiciary's power to supervise executive branch decision making, federal courts generally construe the terms of authorized executive branch settlements narrowly so as to avoid the conclusion that the executive branch has agreed to submit the exercise of otherwise unreviewable discretion to judicially enforceable limits. *See, e.g., Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1019 (7th Cir. 1984) (construing consent decree narrowly to avoid constraining investigatory discretion of FBI); *National Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 305 n.12, 306 (D.C. Cir. 1982) (construing stipulation committing Secretary of Interior to stay federal construction project narrowly to avoid constitutional concerns).

### IV. Specific Limits Set Forth in the Meese Policy

#### A. Promises to Spend Unappropriated Funds or to Seek Appropriations

We now consider the more specific limits on the Attorney General's settlement power that the Meese Policy identifies. We begin with the Attorney General's power to settle litigation on terms that commit the executive branch to expend unappropriated funds or to seek congressional appropriations.

The Meese Policy states that lawyers under the Attorney General's supervision may not enter into consent decrees that "commit[ ] the department or agency to expend funds that Congress has not appropriated and that have not been budgeted for the action in question, or commits a department or agency to seek a particular appropriation or budget authorization." Meese Policy at 3. The policy also pro-

hibits such attorneys from entering into settlement agreements that "commit[ ] the Department or agency to expend funds that Congress has not appropriated and that have not been budgeted for the action in question." Meese Policy at 3–4.[15] We are advised that the policy aids agencies in settlement negotiations by circumscribing the possible scope of a settlement, see Memorandum for John R. Schmidt, Associate Attorney General, from Lois Schiffer, Assistant Attorney General, Environment and Natural Resources Division, *Re: Department Policy Regarding Consent Decrees and Settlement Agreements* (Nov. 1, 1994), but our concern is solely with the degree to which federal law precludes settlements that would contain such commitments.

1. *The legal limits on commitments to make unappropriated expenditures.* The Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. 1, § 9, cl. 7. The Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 427–28 (1990). The Anti-Deficiency Act implements and enforces this principle by prohibiting executive officials from making promises to expend funds in advance of appropriation unless "authorized by law." 31 U.S.C. § 1341 (1994).

Neither the Antideficiency Act nor the Appropriations Clause compels a blanket prohibition against settlements that require the executive branch to expend unappropriated funds. The Appropriations Clause does not preclude authorized promises to make expenditures or to incur obligations in advance of appropriations, and such promises, if authorized by Congress, do not wrest the power of the purse from Congress. Nor do binding commitments to pay money in advance of appropriations place unconstitutional constraints on the exercise of executive discretion. Such commitments may restrict the discretion of executive branch actors in the future by imposing financial obligations that either limit future expenditures or necessitate request for additional appropriations, but the Constitution does not prohibit executive branch actions that have these consequences. *See United States v. Winstar Corp.*, 518 U.S. 839, 873–74 (1996) (holding United States liable for prior promises to bear costs of regulatory change made by executive branch agency officials); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810); Percival, *supra* at 344 ("By necessity, executive agencies undertake many actions that have a profound impact on the policy choices available to future administrations.")

---

[15] Although the policy distinguishes between commitments concerning funds "appropriated" and commitments concerning funds "budgeted," it is not clear what that distinction is intended to signify, and, in any event, the Constitution does not suggest any such distinction. Nor does the Constitution require the policy's different rules regarding funding commitments made in consent decrees and settlement agreements, at least insofar as the commitment contained in each type of settlement is intended to be enforceable by an Article III court.

Indeed, the Antideficiency Act implicitly recognizes that promises to expend unappropriated funds are constitutional because it excepts "authorized" promises of this type from its reach, and courts have held that authorized promises to expend unappropriated funds give rise to enforceable obligations on the United States. *See* Louis Fisher, *The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices*, 29 Cath. U. L. Rev. 51, 61–62 (1979) (collecting cases).[16] Thus, just as Congress may authorize executive branch officials to impound appropriated funds in certain circumstances, *see, e.g., Train v. City of New York*, 420 U.S. 35, 42–47 (1975), it may authorize executive branch officials to commit to the expenditure of unappropriated funds in certain circumstances as well.

Nevertheless, as we have explained, the settlement power may not be exercised in a manner that is inconsistent with statutory limits. This general principle, as applied in this context, means that the limitations that applicable statutory provisions place on the authority of an agency to incur financial obligations in advance of appropriations outside the settlement context will, at least in the ordinary case, also limit the authority of the Attorney General to settle litigation on behalf of that agency on terms that would incur such obligations. In light of the express terms of the Anti-Deficiency Act,[17] this general principle, as applied here, also means that there must be an identifiable source of statutory authority to incur an obligation in advance of an appropriation before a settlement may be entered that would incur one.

The question whether such authority exists will sometimes be a difficult one. As Professor Tribe explains in discussing the distinct, but nonetheless related, context of impoundment, Congress may authorize impoundment implicitly rather than expressly:

> [t]he language and purpose of a particular appropriations bill involved may permit the conclusion that impoundment is consistent with the legislative will. In some cases, the appropriations bill very clearly invests the Executive branch with wide discretion regarding the spending level. In other cases, the use of mandatory language indicates that Congress has not sanctioned impoundment. Needless to say, the vast majority of cases fall somewhere between these

---

[16] For example, if a statute authorizes the government to contract for goods and services and the contract is performed, an obligation may arise that the United States may not avoid simply by refusing to appropriate funds *See* Fisher, *supra* at 61. (Of course, it may be that the obligation will not be satisfied if Congress refuses to appropriate the funds lawfully due.) By contrast, when statutes expressly condition performance by the United States upon congressional appropriations, the government's promise may be enforced only if an appropriation is forthcoming *Id.* at 62.

[17] The Anti-Deficiency Act provides, in relevant part, that "[a]n officer or employee of the United States Government or of the District of Columbia government may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and may not "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A), (B).

> two polls. The Supreme Court has indicated that it will study the legislative history of the appropriations statute and carefully dissect its language in order to determine whether impoundment is permissible.

*See* Laurence H. Tribe, *American Constitutional Law* 259 n.13 (2d ed. 1988). There is a similar range from the express to the implied grant among statutory provisions that grant executive branch officials the authority to commit to financial obligations in advance of appropriations.

In 1980, Attorney General Civiletti elaborated on this point in setting forth the proper analysis for determining whether an agency or official possesses the statutory authority to assume a financial obligation in advance of an available appropriation. *See Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1 (1981). The analysis that he set forth does not make express reference to the settlement context, but it provides useful guidance nonetheless. Attorney General Civiletti explained that "[i]n a few cases Congress has expressly authorized agencies to incur obligations without regard to available appropriations," *id.* at 3 & n.4 (citing 25 U.S.C. § 99; 31 U.S.C. § 668; 41 U.S.C. § 11), but that it will often be "necessary to inquire under what circumstances statutes that vest particular functions in government agencies imply authority to create obligations for the accomplishment of those functions despite the lack of current appropriations." *Id.* at 3. In general, he concluded, "statutory authority to incur obligations in advance of appropriations may be implied as well as express, but may not ordinarily be inferred, in the absence of appropriations, from the kind of broad, categorical authority, standing alone, that often appears, for example, in the organic statutes of government agencies." *Id.* at 4. The authority to make such a commitment instead "must be necessarily inferrable from the specific terms of those duties that have been imposed upon, or of those authorities that have been invested in, the officers or employees purporting to obligate funds on behalf of the United States." *Id.*

In further elaborating upon this analysis, Attorney General Civiletti referred to prior Attorney General opinions that had established that "when Congress specifically authorizes contracts to be entered into for the accomplishment of a particular purpose, the delegated officer may negotiate such contracts even before Congress appropriates all the funds necessary for their fulfillment." *Id.* He also explained, however, that other Attorney General opinions had established that "when authority for the performance of a specific function rests on a particular appropriation that proves inadequate to the fulfillment of its purpose, the responsible officer is not authorized to obligate further funds for that purpose in the absence of additional appropriations." *Id.* As a consequence, the scope of "necessarily inferrable" authority to incur financial obligations in advance of appropriations is quite limited. As we have more recently explained, the "limited number of

government functions funded through annual appropriations [that] must otherwise continue despite a lapse in their appropriations'' include, for example, the ''check writing and distributing functions necessary to disburse'' benefits that operate under indefinite appropriations, the minimal duties that are necessary to closing up an agency during a lapse in appropriations, and the contracting for materials essential to the performance of those emergency services that may continue during a lapse pursuant to an express provision of the Anti-deficiency Act. See Memorandum for Alice Rivlin, Director, Office of Management and Budget, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Government Operations in the Event of a Lapse in Appropriations* at 4 (Aug. 16, 1995).

Attorney General Civiletti added that, notwithstanding the statutory limitations that would ordinarily constrain executive branch authority to incur obligations in advance of appropriations, ''the President performs not only functions that are authorized by statute, but functions authorized by the Constitution as well.'' 5 Op. O.L.C. at 5. He therefore concluded that ''the Antideficiency Act should not be read as necessarily precluding exercises of executive power through which the President, acting alone or through his subordinates, could have obligated funds in advance of appropriations had the Antideficiency Act not been enacted.'' *Id.* at 6. He then identified the conduct of foreign affairs essential to the national security as ''[o]ne likely category into which certain of these functions would fall.'' *Id.* at 7 n.10.

In accord with the above analysis, settlements may raise concerns if they contain terms that contemplate the federal government undertaking actions to be carried out beyond the current appropriations cycle or the terms of the appropriation that, at the moment of settlement, is understood to provide the funding for carrying them out. It may be unclear in such cases whether, at the moment of settlement, funds have been appropriated for carrying out those actions in the future. It may also be unclear whether statutory authority exists that would permit the Attorney General to assume an obligation for the federal government to carry out activities in advance of appropriations to fund them.

Of course, in many instances, the source of the funding for the activity may be the general salaries and expenses appropriation of an agency. Such an appropriation for general salaries and expenses may be available for only one year, but it will in most cases almost certainly be replaced with a substantial, similarly general appropriation the following year. The fact that an available appropriation may be reasonably expected in the following year, however, does not suffice to relieve concern that an executive branch promise to undertake actions in subsequent years may constitute an unauthorized promise to expend funds or incur obligations in advance of an appropriation. An expectation of an appropriation does not itself constitute an appropriation. Thus, absent sufficient authorization, care should be taken to avoid promising to undertake activities in advance of appropriations in entering into even seemingly routine settlements. The possibility

always exists, for example, that an appropriations rider may be appended to the otherwise generally available salaries and expenses appropriation in a subsequent year, which would preclude use of the appropriated funds for the promised purpose.

Because of the limited circumstances in which it is likely to be determined that Congress has conferred the unusual authority to incur financial obligations in advance of appropriations, settlements that would commit the executive branch to undertake activities that would require expenditures in the future should not be understood to constitute enforceable obligations to undertake such activities in the event of lapses in available appropriations unless it is made clear in the settlement that the federal government does intend to incur such an obligation. *Cf. United States v. International Brotherhood of Teamsters*, 172 F.3d 217 (2d Cir. 1999) (holding that the United States had not promised to monitor a union election). In addition, the executive branch should make clear its intention to incur an obligation in advance of appropriations only when (1) the statutory authority to assume a financial obligation in advance of an appropriation may be divined from either express statutory language or "necessary implication from the specific terms of duties that have been imposed on, or of authorities that have been invested in, the agency," 5 Op. O.L.C. at 5, or (2) the obligation in question is "necessarily incident to presidential initiatives undertaken within his constitutional powers." *Id.* at 7.

The existence of the continuing and indefinite appropriation for the satisfaction of certain judgments and settlements, commonly referred to as the judgment fund, does not suffice to constitute broad authorization for settlements that would otherwise appear to constitute unauthorized obligations in advance of appropriations. *See* 31 U.S.C. § 1304 (1994 & Supp. II 1996). "A law that identifies the source of funds is not to be confused with the conditions prescribed for their payment." *Office of Personnel Management*, 496 U.S. at 432. The general statute appropriating funds for judgments and settlements appropriates funds for the payments obligated only by certain types of authorized settlements. *Id.* It is important to note, in this regard, that the settlements identified in the Meese Policy are likely to give rise to expenditures that would not be payable out of the judgment fund. For example, it is likely that Congress will have intended for agency appropriations to fund the activity that the government promises to perform in the settlement, and the mere fact that such agency appropriations are insufficient to permit the activity to be performed will not suffice to make the judgment fund available. *See Availability of the Judgment Fund for the Payment of Judgments or Settlements in Suits Brought Against the Commodity Credit Corporation Under the Federal Tort Claims Act*, 13 Op. O.L.C. 362, 366 n.6 (1989) (quoting 66 Comp. Gen. 157, 160 (1986)); *see* 3 Office of the General Counsel, United States General Accounting Office, *Principles of Federal Appropriations Law* 14–26 (2d ed. 1994) ("[I]f payment of a particular judgment is 'otherwise provided for' as a matter

of law, the judgment appropriation is not available, and the fact that the defendant agency may have insufficient funds at that particular time does not operate to make the judgment appropriation available."). Similarly, it is likely that the terms of such settlements will not be appropriately characterized as involving "money judgment" claims, and thus that they will fall outside the scope of the judgment fund for that reason. *See Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim,* 13 Op.O.L.C. 98, 98–99 (1989) (explaining that "final judgments [or settlements of such judgments] whose payment is not 'otherwise provided for' are payable from the Judgment Fund if they require the government to make direct payments of money to individuals, but not if they merely require the government to take actions that result in the expenditure of government funds."). Thus, the judgment fund should not be thought to obviate the need for an inquiry into either whether funds would be available in the future or whether authority exists for the executive branch to incur an obligation in advance of available appropriations.

2. *The legal limits on executive branch commitments to seek appropriations from Congress.* We previously considered this question in connection with a proposed consent decree that would have required the Departments of Navy and Energy to seek certain appropriations from Congress. We concluded that such a commitment would not have been judicially enforceable. We explained that this conclusion followed from the position we had previously taken that "no executive branch official, including the President, constitutionally could agree to constrain the President's discretion to make whatever legislative proposals he or his successors deemed desirable[.]" Letter for Steven S. Honigman, General Counsel, Department of the Navy, and Robert R. Nordhaus, General Counsel, Department of Energy, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Sept. 12, 1995) ("Honigman Letter").

The constitutional constraint is rooted in Article II, Section 3 of the Constitution, which confers upon the President the duty to "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." Through this clause, the Constitution expressly commits the President to exercise his personal discretion in making legislative recommendations to Congress. *See Chicago School Case* at 17–18; *see generally* J. Gregory Sidak, *The Recommendations Clause,* 77 Geo. L.J. 2079 (1989) (discussing history of the Clause).[18] The President may not divest himself of his constitutional obligation to judge personally which recommendations should be made to Congress, and thus he may not delegate the authority to exercise that discretion to another person. *See* Delegation

---

[18] Some have argued that the Recommendations Clause makes plain that the President is constitutionally permitted to recommend legislation to Congress and does not restrict the President's ability to forego the exercise of his personal discretion in making such recommendations. *See, e g , Chicago School Case* at 17. Our office has rejected that view. *See id* at 17–18; Honigman Letter, *supra.*

Memo at 32 ("if the messages or recommendations are intended to be in exercise of Constitutional duties, the President cannot delegate the responsibilities").

A settlement of the type at issue in this memorandum that contains a presidential promise to seek certain legislation would constitute an impermissible delegation of the President's Recommendations Power. As we have explained, we are concerned in this memorandum only with settlements the terms of which would be subject to direct enforcement by an Article III court. In consenting to a settlement of this type containing a term requiring the President to seek certain appropriations from Congress, the Attorney General necessarily would be consenting to the issuance of a judicial order compelling the President to make a certain legislative recommendation in the event that he failed to do so in conformity with the settlement. In this respect, such a settlement would necessarily delegate a portion of the President's recommendation power to the other party to the agreement, as it would permit that party to call upon the court to require the President to make a legislative recommendation, even if the President's own judgment at the moment of enforcement were that such a recommendation was neither necessary nor expedient. *Chicago School Case* at 15–16 & n.9. Because of the President's constitutional obligation to exercise personal discretion in making recommendations to Congress, moreover, courts are likely to construe narrowly promises that appear to commit the President to seek certain appropriations from Congress. *See id.*

Settlements that commit executive branch officials to make certain legislative recommendations are constitutionally problematic even if they do not purport to preclude the President from making recommendations on his own. The President's constitutional authority to exercise the Recommendations Power could be undermined if the President were precluded from preventing a subordinate executive branch official from making a recommendation by reason of the executive branch's prior consent to a binding term of a settlement. For example, the President may judge that it is necessary or expedient that no recommendation on a particular matter be made at a particular time. However, that presidential judgment would be compromised if an executive branch actor's prior entry into a settlement could give rise to a judicially enforceable obligation that an executive branch official make a recommendation on the precise issue on which the President had judged it necessary and expedient to remain silent. Similarly, the President may have judged that it is necessary and expedient to make a recommendation, the terms of which would contradict the recommendation that a prior settlement would require a subordinate executive branch actor to make. The President's ability to exercise his own recommendation power could be undermined if he lacked the power to preclude a subordinate from presenting a contradictory recommendation to Congress. Thus, such commitments, even if made by subordinate executive branch officers could "constrain the President's discretion to make whatever legislative proposals he or his successors deemed desirable[.]" Honigman Letter at 1.

In addition, Article II, Section 2, Clause 1 of the Constitution states that "[the President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any subject relating to the Duties of their respective Offices." A settlement may not commit a principal officer in a Department to recommend certain appropriations to Congress if such a commitment would impinge upon the President's capacity to obtain information pursuant to the Opinion Clause. For example, an agreement that precluded the officer from disavowing the recommendation when asked by the President for his views would impermissibly interfere with the free flow of information to the President contemplated by the Opinion Clause. *See Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 463 (1855) (explaining that the Opinion Clause requires that the "advice or opinion must of course embody the individual thought of the officer giving it"); Akhil Reed Amar, *Some Opinions on the Opinion Clause*, 82 Va. L. Rev. 647, 672–73 (1996) (discussing how the Clause facilitates the President effective execution of the laws). Finally, the judicial enforcement of settlements that require executive branch officials to provide certain advice within the executive branch, or that commit executive branch officials to make certain recommendations directly to Congress, would raise serious separation of powers concerns apart from any limitations that the Recommendations Clause or the Opinions Clause might impose. *See United States v. Nixon*, 418 U.S. 683, 708 (1974) (tracing executive privilege to separation of powers concerns arising from disruption of President's internal decision making processes); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (explaining that "inquiry into the mental processes of administrative decisionmakers is usually to be avoided"); *Smith v. United States*, 333 F.2d 70, 72 (10th Cir. 1964) (holding that federal court could not mandamus the Secretary of the Interior to make legislative recommendations to Congress); *see Chicago School Case* at 17, 19. That is particularly true when executive branch officials promise to adhere to general standards of conduct in advising the President, such as making "best efforts" in seeking certain appropriations. *See Chicago School Case* at 19. Promises of the former type not only invite impermissible judicial supervision of the executive branch but also lack judicially-manageable enforcement criteria. As the Seventh Circuit has explained, its decision to construe the executive branch consent decree contained in *United States v. Board of Educ.*, 744 F.2d 1300 (7th Cir. 1984), *cert. denied*, 471 U.S. 1116 (1985), so as not to require the United States to seek certain appropriations from Congress was based "in substantial measure . . . [on the] concern that judges should not take control of the budgetary process even with the consent of the parties" *See Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993), *cert. denied*, 511 U.S. 1082 (1994).

## B. Promises to Promulgate Rules

The Meese policy states that a "department or agency should not enter into a consent decree that converts into a mandatory duty the otherwise discretionary authority of the Secretary or agency administrator to revise, amend, or promulgate regulations." Meese Policy at 3. The policy also states that a "department or agency should not enter into a settlement agreement that interferes with the Secretary or agency administrator's authority to revise, amend, or promulgate regulations through the procedures set forth in the Administrative Procedure Act." *Id.*[19] The policy does not identify the types of agency actions that it intends to encompass within the term "regulations" but we consider a broad range of agency regulatory actions below, from the promulgation of legislative rules, which ordinarily are subject to notice-and-comment requirements, to the initiation of investigations, which ordinarily are not.

As we have already explained, the Attorney General ordinarily may not settle litigation on terms that would transgress valid, otherwise applicable, statutory restrictions on agency conduct. *See Executive Bus. Media, Inc. v. United States Dep't of Defense*, 3 F.3d 759, 762 (4th Cir. 1993). If, for example, a statute prohibits an agency from considering a particular factor in evaluating whether to propose a rule, or specifically limits an agency's consideration of potential rules to certain enumerated factors, the Attorney General generally may not settle litigation by committing the agency to consider the prohibited factors in future rule makings. A contrary conclusion would transform the settlement power into a general dispensing power with respect to those statutes that purported to govern agency conduct. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins., Co.*, 463 U.S. 29, 43 (1983) (explaining that "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider"); *Citizens to Preserve Overton Park*, 401 U.S. at 416.

Similarly, when the Administrative Procedure Act ("APA") governs the means by which a rule may be adopted, proposed, or considered, the Attorney General may not resolve litigation, in the absence of an express congressional authorization, by committing an agency to follow a contrary rulemaking process. *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979) (holding agency rule not binding on a court where promulgated in violation of the APA). For example, the Act may require the agency to proceed only pursuant to notice and comment rulemaking, thereby precluding the agency from making an enforceable promise to undertake regulatory action through means other than the notice and comment

---

[19] While the policy forbids only those consent decrees that would limit the discretion to revise, amend, or promulgate regulations, it prohibits any settlement agreements that "interfere[ ]" with the revision, amendment or promulgation of regulations through procedures set forth in the Administrative Procedure Act. It is not clear whether the difference in terminology is intended to reflect a difference in substance. For purposes of this memorandum, we put aside the policy's distinction between consent decrees and settlement agreements and consider the constraints that limit the Attorney General's settlement power generally

procedure. *See Environmental Defense Fund, Inc. v. Costle*, 636 F.2d 1229,1253–55 (D.C. Cir. 1980) (rejecting challenge to EPA consent decree brought under the APA on the ground that the commitment to undertake a preliminary investigation does not constitute a rule within the meaning of the Administrative Procedure Act). Thus, while the APA does not, as a general matter, preclude the executive branch from entering into settlements that would limit the future exercise of congressionally conferred executive branch discretion, actions taken pursuant to settlements are not inherently immune from APA review. *Id.* at 1253–55. To the extent that a discretion-limiting settlement is subject to APA review, moreover, it must conform to the substantive and procedural requirements that the APA imposes upon agency action outside the settlement context. For that reason, settlements that commit an executive branch agency to promulgate substantive rules, which normally may be promulgated only pursuant to notice and comment procedures, are likely to raise serious concerns that they will transgress the APA's limitations on an agency's rulemaking authority.

In addition to the questions that may arise concerning the limitations that the APA may impose on an agency's authority to constrain its regulatory discretion pursuant to a settlement, it will also be important to ensure that a discretion-limiting settlement would not divest an agency of discretion that Congress has mandated that it retain. *See Kendall v. United States ex rel Stokes*, 37 U.S. (12 Pet.) 524, 609–13 (1838); *Binding Arbitration*, 19 Op. O.L.C. at 224 (discussing executive's obligation to "comply with the terms of valid statutes" committing discretionary power to executive branch officials); *see also* Rabkin & Devins, *supra* at 226 (explaining that courts have held that where a statute vests ultimate decisional responsibility in the executive secretary the secretary cannot delegate this authority); *Morgan v. United States*, 304 U.S. 1, 1–4 (1938) (discussing statutory limitations on subdelegation of executive functions). Difficult interpretive questions arise, however, when the statutes that govern agency conduct confer discretion without making clear either that the executive branch's discretion must be retained or that it may be divested.

For example, numerous statutes authorize agencies to exercise their discretion to adopt rulemaking procedures beyond those that Congress has expressly mandated. *See, e.g., USAir, Inc. v. Department of Transp.*, 969 F.2d 1256, 1260 (D.C. Cir. 1992). It is generally presumed that, although agencies are bound to follow such discretionary procedures once they have been adopted, they retain the power to revise these discretionary procedures in accord with statutory requirements governing the process for the revision of such procedures. *Id.* at 1260. It is far less clear, however, that Congress, in conferring procedural discretion upon agencies, intended to permit them to settle litigation on terms that would divest them of their statutorily conferred power to revise such procedures, and that question will be present even in circumstances in which the revision would be undertaken in accord with the statutory provisions governing the process of revision. Similar

confusions may arise with respect to congressional intent regarding the substantive regulatory power of agencies. Congress often authorizes agencies to exercise their discretion in selecting substantive regulatory outcomes without making clear whether those agencies are precluded from settling litigation on terms that would preclude them from revising those selections in the future.

Definitive answers to the interpretive questions that arise when the relevant statutes do not clearly address the executive branch's authority to bind the exercise of the discretion that has been statutorily conferred will necessarily depend upon an examination of the particular statutory context. Nevertheless, certain general principles may help to guide analysis. These principles are set forth in the leading case to have considered the interpretive questions posed by settlements that purport to regulate the policy discretion of executive branch agencies: *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117 (D.C. Cir. 1983).

In *Citizens for a Better Environment*, the court considered a legal challenge to the so-called Flannery Decree, which the Environmental Protection Agency ("EPA") entered into with environmental groups in order to resolve claims that it had failed to implement certain provisions of the Clean Water Act ("CWA"). *Id.* at 1120. The consent decree committed the EPA to a "detailed program for developing regulations to deal with the discharge of toxic pollutants under the CWA." *Id.* Specifically, the decree:

> required EPA to promulgate guidelines and limitations governing the discharge by 21 industries of 65 specified pollutants. It also mandated the use of certain scientific methodologies and decision-making criteria by EPA in determining whether additional regulations should be issued and whether other pollutants should be included in the regulatory scheme. It did not specify the substantive result of any regulations EPA was to propose and only required EPA to initiate "regulatory action" for other pollutants identified through the research program. The regulations envisaged by the Agreement were, after full notice and comment, to be promulgated in phases by December 31, 1979 and the industries affected by them were to comply with them by June 30, 1983.

*Id.* at 1120–21.

After the district court entered the decree, an appeal was taken, and the court of appeals remanded for a determination whether the agreement "impermissibly infringe[d] on the discretion Congress committed to the EPA Administrator to make certain decisions under the CWA." *Citizens for a Better Env't*, 718 F.2d at 1121 (describing decision in *Environmental Defense Fund, Inc. v. Costle*, 636 F.2d 1229, 1259 (D.C. Cir. 1980)). The court of appeals began by rejecting the contention that the consent decree exceeded Article III limits on the judicial

power. Anticipating the Supreme Court's eventual holding in *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986), the court concluded that Article III permitted the district court to issue the consent decree even though it provided relief in excess of what the court could have imposed by injunction. *See Citizens for a Better Env't*, 781 F.2d at 1124–27. The court also rejected the contention that the Article III limits on judicial power established in *Vermont Yankee* (435 U.S. 519 (1978)) prevented the district court from entering a decree that committed the EPA to undertake regulatory steps that "go beyond statutory requirements." *Citizens for a Better Env't*, 718 F.2d at 1125. The court explained that "[t]he Decree here was largely the work of the EPA and the other parties to these suits, not the district court; manifestly the requirements imposed by the Decree do not represent judicial intrusion into the Agency's affairs to the same extent they would if the Decree were 'a creature of judicial cloth.'" *Id.* at 1128 (quoting *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 141 (1981)). It further explained that

> [s]ince the solution arrived at was to a considerable extent the work of the Agency itself, and since the district court's role was confined to approving the fairness of the consent decree which incorporates it and ensuring the consistency of the Decree with the Act, *Vermont Yankee*'s concern for 'judicially-conceived notions of administrative fair play' is inapposite here.

*Citizens for a Better Env't*, 718 F.2d at 1128; *see Costle* Memo at 5–6.

The court of appeals next turned to the question whether statutory provisions that restricted agency authority barred the EPA from binding its discretion in the manner required by the decree. The court noted that the decree imposed only a "limited infringement on the Agency's discretion," *Citizens for a Better Env't*, 718 F.2d at 1129–30, because "it requires EPA to begin the process of formulating regulations in compliance with the Act and describes a methodology to be followed by the Agency, but it leaves the outcome of the process (the substantive regulations) to the Agency's discretion." *Id.* at 1129 n.14. Moreover, it concluded that Congress had impliedly sanctioned this limited, voluntarily-adopted restriction on agency discretion when it amended the CWA in a manner that preserved the decree. *Id.* at 1130.

In so analyzing the issues, the majority impliedly rejected the dissent's constitutional arguments against the decree. The dissent contended that the decree violated the constitutional separation of powers because it permitted an Article III court to require an executive branch agency to "exercise its administrative discretion in a particular way." *Id.* at 1131 (Wilkey, J., dissenting). As a result, the dissent concluded that it was of no consequence that the decree purported to restrict the EPA's discretion only with respect to preliminary procedural decisions, as opposed

to final substantive rules. Any judicially imposed limitation on executive discretion, the dissent contended, was unconstitutional. Moreover, the dissent contended, the decree was particularly problematic because it purported to constrain the discretion of subsequent administrations. In this respect, the dissent argued, the decree could not be said to constitute a voluntary limitation on executive discretion. Rather, the discretion of subsequent administrations would be involuntarily constrained by judicial order.

The majority adopted a contrary premise. It held that Congress may authorize executive branch agencies to divest themselves of the statutorily conferred discretion that they would otherwise have been entitled to exercise, and thus to bind themselves to comply with voluntarily-adopted, judicially enforceable commitments that Congress had not mandated. As we have explained above, our analysis of the constitutional limitations on executive branch settlements that limit congressionally conferred executive branch discretion accords with this holding.

Moreover, although the court of appeals emphasized the distinction between an agency's commitment to undertake certain preliminary procedures in formulating rules and an agency's commitment to reach certain "substantive outcomes" in final regulations, it did not suggest that such a distinction was necessarily of constitutional significance. It simply concluded that this distinction was relevant to a determination whether Congress had intended to permit the EPA to settle on terms that would limit the exercise of its discretion. *Citizens for a Better Env't*, 718 F.2d at 1126. Again, we believe this analysis to be correct, and, indeed, the distinction drawn by the court accords with our conclusion that a settlement that would commit an agency to promulgate substantive regulations of the kind ordinarily subject to the notice and comment requirements of the APA would likely be prohibited by the APA.

The Constitution does not generally prohibit Congress from authorizing the Attorney General to enter into a settlement that binds an agency to adopt regulations, whether they are substantive or procedural in nature, but there are nevertheless sound reasons to conclude that an agency's commitment regarding procedural rules is more likely to have been authorized by Congress than an agency's commitment regarding certain substantive regulatory outcomes. *See Costle* Memo at 5. Similarly, agency commitments of shorter duration are less likely to press the limits of congressional authorization than agency commitments of longer duration. As Professor Shane explains:

> [A] promise to maintain a rule in place for ten years absent "exigent circumstances" or a "national emergency" would appear such a bizarre departure from ordinary administrative procedure — a procedure that Congress has never adopted for any regulation whatsoever — that authority to make such a promise could not

> reasonably be implied merely from a general authorizing statute and
> the Attorney General's broad authority to conduct litigation.

Shane, *supra* at 255; *see also Bowen v. Georgetown University Hosp.*, 488 U.S.
204, 224 (1988) (agency must be expressly authorized to engage in "extraordinary" exercise of retroactive rulemaking).

In addition, in individual cases, the distinction between preliminary procedural
regulations and final substantive rules may be relevant to due process limitations
on agency rulemaking power, *see Environmental Defense Fund*, 636 F.2d at 1257,
or concerns regarding the executive's ability to carry out its constitutionally
assigned functions. *Cf. The Constitutional Separation of Powers*, 20 Op. O.L.C.
at 176–77. In accord with basic principles of statutory construction, therefore,
these constitutional concerns may justify the conclusion that, in some instances,
the ordinary presumption in favor of the Attorney General's settlement power
should give way to the countervailing principle that statutes should be construed
to avoid serious constitutional concerns.

The central point is that federal law restrictions on the scope of settlements
that purport to constrain agency rulemaking authority — both procedural and substantive — are primarily rooted in legislative intent, rather than constitutional rule.
General presumptions regarding legislative intent may provide a basis for concluding that an agency has broader settlement discretion with respect to its procedures than its substantive regulatory decisions, and these presumptions may be
traceable to underlying constitutional principles. In the end, however, it is legislative intent that will, within the broad constitutional limits discussed above, determine the scope of an agency's discretion to circumscribe the exercise of its statutorily-conferred regulatory authority.

Similar issues regarding the limits that federal law places on settlements that
purport to restrict the regulatory discretion of executive branch agencies arise outside the specific context of the rulemaking process. For example, settlements may
purport to restrict the enforcement discretion of executive branch agencies. The
proper analysis is essentially the same as applies to settlements that limit rulemaking discretion.

In *Schering Corp. v. Heckler*, 779 F.2d 683 (D.C. Cir. 1985), for example, the
United States Court of Appeals for the District of Columbia Circuit considered
a suit in which a drug manufacturer sought to invalidate a settlement agreement
between a competing drug manufacturer and the Food and Drug Administration
("FDA"). The settlement would have prohibited the FDA from undertaking certain enforcement activities for 18 months. The settlement concluded litigation that
arose after the FDA had seized a drug that it had claimed was unapproved because
it was "new" within the meaning of the relevant statutory framework. The drug
manufacturer then brought a declaratory judgment action contending that the drug
was not "new," and the FDA counterclaimed. In return for the dismissal of the

declaratory judgment action, the FDA agreed not to pursue enforcement activities against the manufacturer with respect to the drug in question for 18 months. The competing drug manufacturer contended that the settlement agreement amounted to an abdication of the FDA's statutory enforcement obligations.

In rejecting the competing drug manufacturer's claim, the court of appeals explained that the agency had harbored doubts about the status of the drug in question and wished to avoid having the status of the drug determined in a judicial rather than an administrative proceeding. "This was precisely the sort of balancing of agency priorities and objectives, informed by judgments on agency expertise, that, absent some 'law to apply,' should not be second-guessed by a court." 779 F.2d at 686. The fact that the agency had agreed to bind the exercise of its enforcement discretion for 18 months did not change the analysis. It simply represented "the quid pro quo that the agency found necessary to procure [the plaintiff's] abandonment of its declaratory judgment action. We can no sooner question the soundness of this bargain than we could a unilateral agency decision not to prosecute ab ibnitio . . . ." *Id.*[20] Thus, as in *Citizens for a Better Environment*, the court of appeals considered the question as one that turned on congressional intent, rather than constitutional restrictions on the power of the executive branch to limit its discretion to enforce congressional statutes.

## C. Promises to Divest Discretion

The Meese policy states that a "department or agency should not enter into a consent decree that divests the Secretary or agency administrator, or his successors, of discretion committed to him by Congress or the Constitution where such discretionary power was granted to respond to changing circumstances, to make policy, or managerial choices, or to protect the rights of third parties." *See* Meese Policy at 3. The Meese policy also states that

> in any settlement agreement in which the Secretary or agency administrator agrees to exercise his discretion in a particular way, where such discretionary power was committed to him by Congress or the Constitution to respond to changing circumstances, to make policy or managerial choices, or to protect the rights of third parties, the sole remedy for the department or agency's failure to comply with those terms of the settlement agreement should be the revival of the suit.[21]

---

[20] The court noted that because the agency had restricted its enforcement discretion only for a limited period of time, *see Schering*, 779 F.2d at 685–86, and had not finally concluded that the drug was "new," *id.* at 685 n 18, there was no question that the agency "has implemented a policy or pattern of nonenforcement that amounts to 'an abdication of its statutory responsibilities[.]' " *Id* at 686

[21] Again, the Meese policy's distinction between the rules that should apply to consent decrees as opposed to settlement agreements is not mandated by federal law

*Id.*

To the extent that this final limit on the Attorney General's settlement power simply requires executive officials to exercise the discretion that they are required by law to retain, it is unremarkable. As we have explained, when Congress mandates that the executive branch retain discretion over certain questions, the executive branch generally has no authority to divest itself of that discretion. *See Costle* Memo at 5–6. Similarly, when the Constitution vests a discretionary power in the President, such as the power to make recommendations to Congress, the Attorney General may not enter into settlements that divest the President of that constitutionally committed discretion. Absent that constitutional requirement, however, the Attorney General's settlement discretion turns largely on whether Congress has authorized the limitation on administrative discretion proposed in the settlement.

With respect to the effect of settlements on the rights of third parties, there is no general constitutional limitation on discretion-limiting settlements even though such settlements may have consequences for persons or entities not party to the settlements and even though the settlement may therefore constrain the executive branch's capacity to take account of the interests of non-parties in the future. To the extent that a settlement would infringe a legal right of a third party, whether statutory or constitutional, however, the settlement would likely be unlawful as an initial matter, wholly apart from the question whether it may be subject to collateral attack. *See Local 93, Int'l Ass'n of Firefighters*, 478 U.S. at 526 (explaining that consent decree mandating affirmative action plan would have to conform to the Equal Protection Clause); *Martin v. Wilks*, 490 U.S. 755, 762 (1989) (holding, in connection with challenge to consent decree implementing affirmative action program, that "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings"). Finally, general statutory provisions such as the Administrative Procedure Act may limit the manner in which agencies may adopt certain regulations that would affect the interests of third parties, by, for example, requiring that such regulations be adopted only after notice and an opportunity for comment by interested parties has been provided. These statutory limitations may therefore constrain the exercise of the settlement power in a manner that is protective of third parties.

## V. Conclusion

In general, the Attorney General is free to enter into settlements that would limit the future exercise of executive branch discretion that has been conferred pursuant to statute. Such settlements must be consistent, however, with statutory provisions that directly limit the Attorney General's settlement power as well as statutory limitations that constrain the authority of the executive branch agencies

on behalf of which the settlement is entered. The Constitution may bar settlements limiting the exercise of statutorily conferred discretion in extraordinary circumstances, and Article III may render certain types of promises contained in such settlements unenforceable, but neither Article II nor Article III should be understood to impose substantial impediments to the generally broad power of the Attorney General to exercise the settlement discretion that Congress has authorized her to exercise. Article III does not preclude her from settling simply because a court could not have imposed similar discretion-limiting terms by an ordinary injunction. On the other hand, with respect to settlements that would limit the future exercise of discretion that has been conferred upon the executive branch directly by the Constitution, such as the discretion that is conferred upon the President by the Pardon Power or the Recommendations Clause, the scope of the Attorney General's settlement power is constrained by the very constitutional provisions that vest discretionary authority in the President and therefore necessarily preclude the President from subjecting the exercise of that discretion to the control of the other party to a settlement or to judicial enforcement.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*